Francine M. NEILSON, Plaintiff,

v.

**COLGATE–PALMOLIVE COMPANY and Colgate Palmolive S.A. de C.V., Defendants.**

No. 94 Civ. 7643 (JSR).

United States District Court, S.D. New York.

Feb. 18, 1998.

Francine M. Neilson, pro se.

James Niss, Guardian ad litem.

Bettina B. Plevan, Proskauer Rose Goetz & Mendelsohn, New York City, for Defendants.

## *MEMORANDUM ORDER*

RAKOFF, District Judge.

Plaintiff Francine M. Neilson initiated this lawsuit on October 20, 1994, when her then-counsel, the firm of Vladeck, Waldman, Elias & Englehard, P.C. (the "Vladeck firm"), filed a complaint on her behalf asserting claims of employment discrimination and retaliation under 42 U.S.C. § 1981, Title VII, and various provisions of New York State and City law against her former employer, defendants Colgate–Palmolive Company and Colgate–Palmolive S.A. de C.V. From the outset, however, plaintiff exhibited contentious tendencies and psychological infirmities that eventually led the Vladeck firm to successfully petition the Court to withdraw as counsel on grounds of irreconcilable differences with their client. *See* February 25, 1997 Memorandum and Order of Magistrate Judge Katz. Shortly thereafter, the case was reassigned to this judge, who attempted to move the case to trial.

Unable to obtain further counsel, plaintiff proceeded *pro se*, evidencing, in every conference with the Court, acute mental instability—a disability all the more unfortunate in light of her obvious intelligence and articulateness. Ultimately, following a motion by defendants to appoint a guardian ad litem to stand in plaintiff's stead for purposes of this litigation, *see* Defendants' July 16, 1997 Notice of Motion, the Court ordered a psychiatric evaluation of plaintiff by Dr. Sydney E. Pulver, M.D. Following his examination, Dr. Pulver concluded that plaintiff should "be found incompetent to pursue the current litigation" and recommended appointment of a guardian. *See* September 5, 1997 Report of Dr. Pulver at 3. Although the Court then scheduled a full hearing at which plaintiff could contest the appointment of any guardian ad litem, plaintiff chose instead to consent in writing to the appointment. *See* September 15, 1997 Letter from Francine M. Neilson. Nonetheless, the Court conducted its own *de novo* review of the evidence, and, as detailed at the hearing on September 18, 1997 and in an order issued later that same date, made its "own independent finding that the plaintiff is not competent to proceed without the assistance of a guardian ad litem." September 18, 1997 Transcript at 2. *See generally Thomas v. Humfield,* 916 F.2d 1032, 1034–35 (5th Cir.1990).[1]

Accordingly, on September 18, 1997, the Court appointed James Niss, Esq. to act as plaintiff's guardian ad litem in this case, with full power "to interpret the guardianship in the broadest possible light commensurate with justice" and necessity. September 18, 1997 Transcript at 5; *see* Fed. R. Civ. Pro. 17(c). After a thorough review of the underlying case, the Guardian Ad Litem concluded that the plaintiff's chances of prevailing on her Complaint were miniscule but that she had a separate disability claim against defendants that, although either overlooked or ignored by plaintiff's prior counsel, could provide her with a viable claim against defendants. On this basis, the Guardian Ad Litem

---

1. On the basis of suggestions subsequently raised by plaintiff and by counsel for her son, Scott Neilson, that she had not fully appreciated the ramifications of her consent to the appointment of the guardian ad litem, *see* Torres Aff. ¶ 8; November 25, 1997 Transcript at 9, 11; December 29, 1997 Neilson Submission ("Inability to Obtain a Fair and Impartial Trial—Removal of Ad Litem"), the Court has once again reviewed the bases for its prior findings and concludes that the evidence of Ms. Neilson's mental incapacity to act on her own behalf in this litigation is not only unrebutted and overwhelming but has been further corroborated by subsequent hearings in this Court, *see, e.g.,* November 25, 1997 Transcript at 15–16, and elsewhere. Indeed, plaintiff has now been adjudicated "incapacitated" by the State of New York. *See* Torres Affidavit ¶ 10.

negotiated a proposed settlement with defendants that would secure for plaintiff lifetime coverage under a Colgate HMO Medical Plan; payment of $2,500 a month until plaintiff (who is currently 57) turns 65 or begins receiving CIGNA disability benefits; defendants' assistance and financial support in plaintiff's (or her general guardian's) pursuit of long-term disability benefits from CIGNA; and, regardless of the outcome of the CIGNA claim, the regular pension to which plaintiff would be entitled as a disability benefits recipient. In negotiating this settlement with defendants, the Guardian Ad Litem was acting well within the scope of his powers, since a guardian ad litem appointed under Federal Rule of Civil Procedure 17 is an officer of the court with "full responsibility to assist the court to 'secure a just, speedy, and inexpensive determination of the action.'" *Noe v. True,* 507 F.2d 9, 12 (6th Cir.1974) (quoting *Fong Sik Leung v. Dulles,* 226 F.2d 74, 82 (9th Cir.1955) (Boldt, J., concurring)).

On January 13, 1998, the Guardian Ad Litem moved, on notice to all affected persons, for this Court's approval of the proposed settlement. Following receipt of papers, the Court conducted a hearing on January 28, 1998. Both in papers and by oral argument at the hearing, counsel for Scott Neilson opposed approval of the settlement until the entire proposal could be reviewed by a general guardian for plaintiff whose appointment is now pending in New York State Supreme Court. *See* In the Matter of the Application of Scott Neilson for the Appointment of a Guardian of Francine M. Neilson, Supreme Court, New York County, Index No. 500213/97. Counsel for Mr. Neilson argued that this would be in keeping with New York State law, under which only a general guardian may recommend that a New York court approve settlement of a claim brought by an incompetent party. *See* N.Y. C.P.L.R. § 1207; *Tudorov v. Collazo,* 215 A.D.2d 750, 627 N.Y.S.2d 419, 419–20 (2d Dep't 1995).

Such an approach is ill-suited to the federal context, however, where Rule 17 provides for appointment of a guardian ad litem

with plenary powers over the pending federal lawsuit but no procedure exists for appointing a general guardian over a litigant's person or property. Indeed, deference to New York State law in this regard would in many cases render Rule 17 a virtual nullity. Here, while the Court, pursuant to Local Civil Rule 83.2 ("Settlement of Actions by or on Behalf of Infants or Incompetents and Wrongful Death Actions") has otherwise closely followed the procedures and rules prescribed by New York State law, there is ample "good cause" not to await appointment of a general guardian. *See* Local Civil Rule 83.2 ("The proceeding upon an application to settle or compromise such an action shall conform, as nearly as may be, to the New York State statutes and rules, but the court, for cause shown, may dispense with any New York State requirement.").

This is not simply because adherence to such a requirement would be inconsistent with the purposes of Rule 17, but also because in this very case it would lead to extended and prejudicial delay. Although the State Court has acted expeditiously to find Ms. Neilson incapacitated, counsel do not expect the general guardian to actually be appointed for at least a month. *See* January 28, 1998 Transcript at 9. Thereupon, the general guardian would be required effectively to duplicate the efforts of the Guardian Ad Litem in investigating and evaluating plaintiff's claims—efforts that have already required more than four months of the Guardian Ad Litem's time and expenditures of $10,020 (through December, 1997) in federal funds.[2] Thus, it is reasonable to anticipate a delay of many months before the general guardian could give this Court its evaluation of the proposed settlement. Such delay would be highly prejudicial to plaintiff's interests, depriving her of much-needed benefits that would flow to her immediately under the settlement agreement. It would be further detrimental to her interests in that the fees and expenses of the general guardian, under New York State law, most likely would be funded by plaintiff's own estate. *See* N.Y. Mental Hyg. L. § 81.28; *Matter of Skinner,*

---

**2.** The costs to the federal fisc would have been significantly more except for the Court's requiring defendants to bear the first $10,000 of the Guardian Ad Litem's fees.

171 Misc.2d 551, 655 N.Y.S.2d 311, 312 (Sup. Ct.N.Y.Cty.1997). Nor can the Court perceive any genuine benefit from this costly duplication, since the Court is fully satisfied, after careful review, that the investigation conducted by the Guardian Ad Litem is a model of thoroughness, competence, and devotion to plaintiff's interests.

The Court turns, therefore, to an examination of the merits of the proposed settlement. Keeping in mind a court's "inherent duty to protect the interests of minors and incompetents that come before it," *Eagan v. Jackson*, 855 F.Supp. 765, 775 (E.D.Pa.1994), the Court has conducted an extensive, independent review of the proposal, and has concluded that the terms of the settlement serve plaintiff's best interests.[3] In particular, the Court completely concurs with the Guardian Ad Litem's evaluation of the dubious merits of plaintiff's underlying claim—which rests so crucially on the testimony of a plaintiff who is not only mentally unstable but who has repeatedly contradicted herself in proceedings before this very court—and specifically adopts by reference the Guardian Ad Litem's detailed findings and conclusions in that regard.[4] Thanks to the Guardian Ad Litem's independent efforts in unearthing potentially meritorious disability claims that are not part of the underlying lawsuit, the Guardian Ad Litem has been able to negotiate a proposed settlement that assures plaintiff of health care and a steady, significant stream of income. Indeed, under the proposed terms, even if plaintiff's disability claim against CIGNA proves unsuccessful, plaintiff will receive $30,000 a year for the next eight years and a reasonable pension thereafter. This is an eminently fair result that is well-tailored to this plaintiff's particular needs. (Indeed, even Mr. Neilson's papers do not object to the substance of the settlement's terms themselves but only to the alleged deficiency in the procedure.) Accordingly, the recommended settlement is approved.

The remaining issue before the Court relates to the possibility that plaintiff's former counsel, the Vladeck firm, might attempt to assert an attorney's lien over the stream of income generated by the settlement. Specifically, the Vladeck firm claims that plaintiff owes it approximately $150,000 in fees and expenses under retainer agreements signed in 1994 and 1995, *see* Vladeck Affidavit ¶ 27; Niss Declaration ¶ 8, and contends that the firm's withdrawal from its representation of plaintiff will not block its assertion of an attorney's lien if the firm can ultimately demonstrate that the withdrawal was for good cause. *See* N.Y. Jud. L. § 475; *Hallmark Capital Corp. v. Red Rose Collection, Inc.*, 1997 WL 661146, at *3 (S.D.N.Y.1997); *Petition of Rosenman & Colin*, 850 F.2d 57, 61 (2d Cir.1988). Nonetheless, the Guardian Ad Litem, seeking to preserve entirely for plaintiff's benefit the stream of income from the settlement, requests in effect a declaratory judgment from this Court that no attorney's lien may attach to such income.

Despite the Court's doubts about the Vladeck firm's putative claim, the Court sees no good reason for prospectively barring that firm from pursuing the claim and therefore denies the proposed declaration. The Court will, however, retain exclusive jurisdiction over any claims against the plaintiff or her estate for fees and expenses arising out of this litigation. *See Chesley v. Union Carbide Corp.*, 927 F.2d 60, 64 (2d Cir.1991); *Cluett, Peabody & Co. v. CPC Acquisition Co.*, 863 F.2d 251, 256 (2d Cir.1988); *Harley & Browne v. Ressler & Ressler*, 957 F.Supp. 44, 47 (S.D.N.Y.1997). Thus, any application by the Vladeck firm to assert such a claim or

---

**3.** While there is no established standard for evaluating the reasonableness of settlement in a situation such as the instant case, the Court has looked for guidance both to the relevant New York state statutes, *see* N.Y. C.P.L.R. §§ 1207–08, and to the somewhat analogous standards for evaluating the reasonableness of a class action settlement, *see Thomas v. City of New York*, 1995 WL 519991, at *1–2 (E.D.N.Y.1995) (Report and Recommendation of Magistrate Judge Gold); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 24 (2d Cir.1987) (summarizing the factors used to evaluate a proposed class action settlement).

**4.** Conversely, the Court rejects as conclusory, self-serving, and unreliable the claims by the Vladeck firm that the plaintiff they successfully sought leave to abandon actually has a good case (good enough, that is, to warrant their asserting a lien for attorneys' fees). *See* Vladeck Aff. ¶¶ 4–15.

impress a lien based on such a claim must be made to this Court and may not be made to any other state or federal court.

For the foregoing reasons, the Court hereby (i) approves the terms of the Agreement and Release attached as Exhibit A to the January 13, 1998 Declaration of James Niss and directs the parties to submit to the Court the stipulation and order of dismissal referenced in paragraph 1 of that Agreement within ten days of the date of this Order, and (ii) retains exclusive jurisdiction over any claims or remedies against the plaintiff or her estate for fees and expenses arising out of this litigation.

SO ORDERED.