Francine M. NEILSON,
Plaintiff–Appellant,

v.

COLGATE–PALMOLIVE COMPANY
and Colgate Palmolive S.A. de
C.V., Defendants–Appellees.

No. 867, Docket 98–7489.

United States Court of Appeals,
Second Circuit.

Argued March 2, 1999.

Decided Dec. 2, 1999.

Judith P. Vladeck, New York, N.Y. (Laura S. Schnell, Vladeck, Waldman, Elias & Engelhard, P.C., on the brief), for Plaintiff–Appellant.

Bettina B. Plevan, New York, N.Y. (Reginald D. Odom, Gregory D. Wong, Proskauer Rose Goetz & Mendelsohn LLP, on the brief), for Defendants–Appellees.

Before: JACOBS and SOTOMAYOR, Circuit Judges, and SAND, District Judge.*

Judge SOTOMAYOR dissents in part in a separate opinion.

JACOBS, Circuit Judge and SAND, District Judge:

Francine Neilson brought suit in the United States District Court for the Southern District of New York (Rakoff, *J.*), alleging sex and race discrimination on the part of her former employers, Colgate–Palmolive Company and Colgate Palmolive S.A. de C.V. (collectively, "Colgate"). The district court appointed a guardian ad litem for Neilson, who (it was learned) had been committed to psychiatric hospitals. The guardian ad litem negotiated a settlement on Neilson's behalf, the court approved the settlement, and judgment was entered dismissing the action with prejudice.

Neilson appeals through a general guardian who was subsequently appointed in state court. Neilson challenges the district court's (1) appointment of the guardian ad litem; (2) approval of the settlement; and (3) refusal to delay settlement consideration until after the appointment of the general guardian.

Colgate has moved to dismiss the appeal on the ground that the general guardian lacks standing.

---

* The Honorable Leonard B. Sand, of the United States District Court for the Southern District of New York, sitting by designation.

We conclude that the general guardian has standing, and we affirm.

## BACKGROUND

Neilson is a certified public accountant who was hired by Colgate in 1980 as a staff auditor in its New York Auditing Department. She was promoted to Audit Supervisor in 1982, and to Audit Manager in 1984. In February 1987, she was transferred to a Colgate subsidiary in Mexico, where she became the Director of Operations and Systems Analysis.

Neilson worked in Mexico for six years. Toward the end of that time, she voiced frustration to management about her career path.

In August of 1993, Neilson was transferred back to New York and assigned the temporary job of assessing operations. According to Neilson, this was an interim arrangement pending a permanent position. According to Colgate, Neilson was told that she would be fired unless, within six months, she interviewed for a permanent position at Colgate and was offered one.

In February 1994, Colgate offered Neilson an unsolicited severance package. At or about the same time, Colgate identified four positions at Colgate for which Neilson could interview. Neilson told Colgate that none of the four positions were commensurate with her skills and abilities, but she agreed to interview for one of the slots, which was in Colgate's Household Surface/Fabric Care Department.

Later that month, Neilson filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging sex and race discrimination.

After her interview in the Household Surface/Fabric Care Department, Neilson met with Michelle Mayes of the Human Resources Department. It is undisputed that Mayes offered Neilson three options: she could either (1) accept the position at Household Surface/Fabric Care and drop the EEOC charge; (2) take the severance package and drop the EEOC charge; or (3) be fired. Mayes testified that she also advised Neilson that she was not the best candidate for the position, but that the job was being offered only as "an accommodation ... provided in exchange she dropped her EEOC charge." Mayes's memo to Neilson after the meeting reiterated Colgate's position, *i.e.*, that Colgate was offering her the position in the Household Surface/Fabric Care Department as a "final special accommodation," notwithstanding its determination that she was "not the most qualified candidate for the position."

Neilson decided to pursue the EEOC charge, and so advised Mayes by letter on May 23, 1994. On May 31, 1994, Neilson was fired.

Neilson filed suit against Colgate in the Southern District of New York, alleging, among other things, that Colgate had (1) taken adverse employment actions against her because of her sex and race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as well as New York's Human Rights Law, N.Y. Exec. Law § 290 *et seq.*; (2) failed to respond to her complaints of a sexually hostile work environment; and (3) retaliated against her for filing the EEOC complaint, also in violation of Title VII and New York's Human Rights Law.

Colgate moved for partial summary judgment in February 1996. Neilson's lawyers, Vladeck, Waldman, Elias & Engelhard, P.C. ("the Vladeck firm"), filed opposing papers. Soon after, however, the Vladeck firm filed a sealed motion to withdraw as counsel. According to Magistrate Judge Theodore Katz, with whom the motion was lodged, the firm believed that its deteriorating relationship with Neilson would impair its effective representation. Judge Katz granted the motion to withdraw in February 1997.

On June 3, 1997, the district court granted partial summary judgment in favor of Colgate. Neilson's remaining claims alleged discrimination based on sex and

race, as well as retaliation for filing the EEOC charge.

At some point, Colgate's counsel learned that Neilson had been involuntarily committed to psychiatric hospitals after she left Colgate. At a pretrial conference on July 9, 1997, Colgate advised the court that it had recently discovered Neilson's psychiatric history and announced that it was giving consideration to a motion for appointment of a guardian ad litem.

The following week, Colgate moved under Federal Rule of Civil Procedure 35 for an order directing Neilson to submit to a psychiatric examination. Under Federal Rule of Civil Procedure 17(c), Colgate also sought the appointment of a guardian ad litem for Neilson if that proved necessary.

Neilson—who was appearing *pro se* following withdrawal of her counsel—responded that she was "sufficiently competent to make rational decisions," that no "guardian [wa]s needed to handle her every day thinking processes," and that what she did need was appointed counsel: "Because Neilson is sufficiently competent to make rational decisions does not mean that she is also sufficiently competent to act in the capacity of an attorney before the court." She concluded:

> Court has the ability to provide protection of incompetent person. Neilson may consider such an appointment to be beneficial such that these type events do not reoccur. The appointment of legal counsel is also required under the circumstances, and urge the court's attention to the matter, allowing Ms. Neilson relief.

On August 15, 1997, the district court found that it was in Neilson's best interests to submit to the psychiatric examination, and told Colgate to prepare a draft order "setting forth the exact date, time, place, manner, conditions, and scope of the examination and the person by whom it is to be made," directing Colgate to fund the cost, and warning that failure by Neilson to submit to the examination would result

in "dismissal of her case with prejudice." Colgate submitted such an order and the district court signed it.

Dr. Sydney Pulver reported to the district court on September 5, 1997 that Neilson was experiencing a "major delusional system," one that appeared to have begun prior to her departure from Mexico. According to Dr. Pulver, Neilson believed that "[s]ome group" was "attacking [her] and [her] family 24 hours a day, 7 days a week, 52 weeks a year," and she "hinted" that Colgate–Palmolive and its law firm were responsible for the campaign against her. Dr. Pulver's diagnosis was "a severe Chronic Paranoid Disorder," and his recommendation was that she "be found incompetent to pursue the current litigation." Dr. Pulver added that Neilson herself had requested "that a Guardian be appointed to pursue the litigation for her."

On September 10, 1997, the district court directed the parties to appear at a September 18, 1997 hearing "for the purpose of considering [Dr. Pulver's] recommendation." The order provided that Neilson could consent to the appointment of a guardian ad litem by submitting a written declaration to that effect no later than September 15, 1997.

Neilson responded to this invitation in a letter dated September 15, 1997:

> In response to Order of September 10, 1997, I again consent to the appointment of a guardian ad litem in addition to an attorney and the protection necessary to ensure that I am able to be free of harassment, intimidation, collateral attacks, mental, physical and emotional abuse such that I can live. As I have said repeatedly, I fear for my life. And, I am not competent to litigate this case.

At the September 18 conference, the district court appointed James Niss, Esq., as guardian ad litem. The court cited its reliance "on [Dr. Pulver's] report, [Neilson's September 15] consent, the other papers submitted, and also [the court's]

own independent finding that the plaintiff is not competent to proceed without the assistance of a guardian ad litem." The court ordered Colgate to pay the first $10,-000 of the guardian's fees,[1] and told Niss to report back on or before October 27, 1997 "as to whether this matter should proceed promptly to trial, [or] whether other steps are appropriate."

In a subsequent letter, Neilson suggested to the court that she had consented to the guardian's appointment because she feared that her case would otherwise have been dismissed:

> For fear of having the case dismissed, ProSe plaintiff agreed to the ad litem as well as to an attorney and protection because she feared for her life asking the Court to use [its] broad discretionary powers in following Rule 17(c).

At the October status conference, Niss advised that settlement talks were under way, and the court granted an adjournment. At the November status conference, Niss and Colgate reported that a settlement had been reached and would be sewn up within the next two weeks. Also present at the conference was Jose Luis Torres, Esq., counsel to Neilson's son, who advised that he had filed a petition in the Supreme Court of the State of New York, New York County, seeking the appointment of a general guardian for Neilson. Under New York law, a general guardian has the authority "to act on behalf of an incapacitated person in providing for personal needs and/or for property management." N.Y. Mental Hyg. Law § 81.03 (McKinney 1996).

On January 13, 1997, Niss moved for court approval of the settlement. Niss's declaration described his investigations on Neilson's behalf, and opined that "Neilson had no viable case under the civil-rights laws," in part because (as Niss had concluded from consulting Dr. Pulver[2]) the onset of Neilson's mental illness was no later than 1993—prior to Neilson's departure from Colgate. Niss was concerned that, as a result of the illness, Neilson had been unable to do her job at Colgate, and that the allegations in Neilson's complaint were "the product of [her] illness," a fact which, he stated, "would be apparent to the jury if Ms. Neilson's claims were tried." According to the Niss declaration, none of Neilson's claims was "triable" because "Neilson is in no mental condition to testify and would not be a credible witness if she did."

Niss concluded from his investigation, however, that Neilson had a viable claim for long-term disability benefits under Colgate's group disability policy, although he anticipated that the circumstances and size of the claim were such that the insurer might contest it.

In light of all that, Niss negotiated the following settlement with Colgate: In exchange for a release of all of Neilson's claims (including her statutory right to attorney's fees), Colgate would "cooperate fully and use its best efforts to assist" with Neilson's application for disability benefits, and would pay up to $50,000 of Neilson's expenses of collection. Colgate also would pay Neilson $2,500 per month until disability payments commenced or Neilson turned 65, whichever came first. Neilson would in turn "assign to Colgate a portion of any retroactive lump-sum payment she receive[d] from [the insurer] equal to the

---

1. *Cf.* N.Y. C.P.L.R. § 1204 (McKinney 1997) ("A court may allow a guardian ad litem a reasonable compensation for his services to be paid in whole or part by any other party or from any recovery had on behalf of the person whom such guardian represents or from such person's other property.").

2. In an affidavit also submitted by Niss, Dr. Pulver stated that, in his opinion, "Neilson's paranoid ideation was present early in her employment with Colgate and may have been present all of her life; ..., by 1993, it had consolidated into a full-blown paranoidal delusional system; and ... a delusional psychosis has persisted ever since, centering on Colgate but incorporating into it anyone else who impacts on her life."

total amount of the monthly payments made to her by Colgate." Colgate also would furnish HMO medical coverage, and would pay Neilson a full disability pension beginning at age 65.

Niss expressed his view that the settlement was in Neilson's best interests. "Unfortunately," he added, he had been unable to resolve the claim by the Vladeck firm that Neilson owed approximately $136,000 in fees and expenses. According to Niss, the firm had refused to settle this claim, and was threatening to "assert a lien on the monthly payments and thereby impair the plan ... to provide a steady stream of income to Ms. Neilson for life." Niss therefore asked the Court "to order that no attorney's lien shall attach to the benefits flowing to Ms. Neilson under the Agreement."

The district court also had the benefit of an affidavit of Judith Vladeck, Esq., which urged the court to deny Niss "any authority to interfere with [her] firm's relationship with [its] former client" and to "defer any question concerning ... fees" until a general guardian could be appointed on Neilson's behalf. As to the merits of Niss's proposed settlement agreement, Vladeck believed that Neilson's suit was viable, and recommended that the settlement be rejected so that a more favorable one could be reached. In support, Vladeck cited her firm's expertise in employment cases, Colgate's failure to move for summary judgment with respect to all of Neilson's supposedly delusional allegations, and the especially promising character of Neilson's retaliation claim, which (she argued) alleged "precisely what the anti-retaliation provision[s] of the law were intended to address: after filing an EEOC charge, Ms. Neilson's continued employment was *conditioned* on her dropping the charge, a *per se* violation of Title VII."

An affidavit filed by Torres on behalf of Neilson's son advised that a petition for a general guardian had been granted, and that "a guardian of both the person and property of Francine M. Neilson [would]

be appointed shortly." Torres asked that the court withhold approval of the settlement until the guardian could determine whether it was in Neilson's best interests, noting that Niss "lack[ed] sufficient information about the plaintiff's current personal and financial situation" to make such a judgment. Torres later acknowledged that his client had not "take[n] a position with respect to the settlement" and had "indicated that it might very well be a perfectly good settlement for his mother."

At a hearing on January 28, 1998, the district court heard argument on Niss's motion to void the Vladeck firm's attorney's lien, as well as on the request that the approval of the settlement be delayed pending the appointment of a general guardian.

On February 18, 1998—before the general guardian was appointed—the district court issued an opinion and order approving the settlement. *See Neilson v. Colgate–Palmolive Co.,* 993 F.Supp. 225 (S.D.N.Y.1998). In the court's view, the settlement served Neilson's "best interests" and achieved "an eminently fair result." *Id.* at 228. Having conducted an "extensive, independent review of the proposal," the court agreed with Niss that Neilson was unlikely to succeed at trial, because Neilson's claims "rest[ed] so crucially on the testimony of a plaintiff who is not only mentally unstable but who has repeatedly contradicted herself in proceedings before this very court." *Id.*

The court denied Niss's request that it void the Vladeck firm's attorney's lien, but expressed "doubts about the Vladeck firm's putative claim" for fees and expenses and "retain[ed] exclusive jurisdiction over any claims against the plaintiff or her estate for fees and expenses arising out of this litigation." *Id.*

Soon after the settlement was approved, the state court appointed Alfreida B. Kenny to serve Neilson as general guardian.

Neilson appealed the district court judgment, by Kenny as guardian and by the Vladeck firm as counsel.

## DISCUSSION

### A. Standing

■ Colgate argues that the general guardian lacks standing to appeal on Neilson's behalf. Colgate relies on *Garrick v. Weaver*, 888 F.2d 687 (10th Cir.1989), in which the district court had found that a plaintiff mother had a conflict of interest with her co-plaintiff children, and appointed a guardian ad litem to represent the infants. *See id.* at 689–90. After settlement, both the guardian ad litem and the mother appealed. *See id.* at 690. The Tenth Circuit dismissed the mother's appeal to the extent that it asserted claims on the infants' behalf, on the ground that as a result of the guardian ad litem's appointment, she lacked standing to prosecute those claims. *See id.* at 692–93; *see also Hull v. United States*, 53 F.3d 1125, 1126–27 (10th Cir.1995) (dismissing, for lack of standing, appeal brought by parents on minor child's behalf where child's guardian ad litem had chosen not to appeal); *Susan R.M. v. Northeast Indep. Sch. Dist.*, 818 F.2d 455, 457–58 (5th Cir. 1987) (concluding that father lacked standing to pursue action on minor plaintiff's behalf where he had allowed a state agency to become plaintiff's managing conservator).

■ *Garrick* stands for the (sound) proposition that only one party may act in a representative capacity with respect to an infant or incompetent who comes before the court. *See Garrick*, 888 F.2d at 693

("Allowing two parties, the court-appointed guardian ad litem and Garrick, to represent the minor children interferes with the orderly development of the lawsuit. . . ."). But this principle does not foreclose Neilson's general guardian from pursuing an appeal on her behalf.

■ Federal Rule of Civil Procedure 17(a) provides that "[e]very action shall be prosecuted in the name of the real party in interest." Fed.R.Civ.P. 17(a). Before the general guardian was appointed (and notwithstanding Niss's appointment as guardian ad litem), the real party in interest in this suit was Neilson. *See* 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1548, at 373–74 (2d ed. 1990) ("A guardian ad litem . . . is a nominal party only; the ward is the real party in interest. . . ."). When Kenny was appointed as the general guardian, however, Kenny became the real party in interest. *See* N.Y. C.P.L.R. § 1004 (McKinney 1976 & Supp. 1999) (providing that a committee of the property of a judicially declared incompetent [3] "may sue or be sued without joining with him the person for or against whose interest the action is brought"); 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *supra,* § 1548, at 372 ("State substantive law usually provides that the general guardian of a minor or incompetent has the legal right to maintain an action in his own name for the benefit of his ward. Under a rule or statute of this type the general guardian is the real party in interest for purposes of Rule 17(a). . . ."). She therefore replaced Niss as Neilson's representative.[4] *See Calla-*

3. According to the Practice Commentaries to § 1004, "incompetency and conservatorship proceedings [have been] abolished and replaced by Article 81 of the Mental Hygiene Law, which creates a unified proceeding for the appointment of a guardian for personal needs or property management of an incapacitated person." Vincent C. Alexander, *Supplementary Practice Commentaries* § C1004:1 (McKinney Supp.1999) (internal quotation marks omitted). The implementing legislation of Article 81 provides: " 'Wherever a

statute uses the terms conservators or committees, such statute shall be construed to include the term guardian . . . unless the context otherwise requires.' " *Id.* (quoting implementing legislation).

4. Under Federal Rule of Appellate Procedure 43—"Substitution of Parties"—the general guardian was entitled to file the notice of appeal even though she had not previously been substituted for Neilson. *See* Fed. R.App. P. 43(b) ("If a party needs to be substituted

*han v. New York Cent. & Hudson River R.R.*, 99 A.D. 56, 90 N.Y.S. 657, 659 (3d Dep't 1904) ("We are of the opinion that the action· was properly commenced [by the guardian ad litem] on behalf of the infant, and that, a committee .of his property having since been appointed, the order substituting such committee as the party plaintiff in place of and on behalf of the infant, by his guardian, was right."); 67 N.Y. Jur.2d Infants § 594, at 276–77 (1988) ("Since an action in favor of an incompetent may properly be commenced by his guardian ad litem, an order substituting the [general guardian] of an incompetent for his guardian ad litem … need not be made nunc pro tunc as of the time of the commencement of the action. Rather, where a committee is subsequently appointed, he may be substituted at any time." (footnotes omitted)); *see also* N.Y. C.P.L.R. § 1016 (McKinney 1997) ("If a party is adjudicated incompetent …, the court shall order substitution of his [general guardian]."). Accordingly, we find that Kenny has standing to bring an appeal on Neilson's behalf.

### B. The Appointment of the Guardian Ad Litem

■ Neilson's sole challenge to the district court's decision to appoint a guardian ad litem concerns the procedures followed by the district court. Because a litigant possesses liberty interests in avoiding the stigma of being found incompetent, *see Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), and in retaining personal control over the litigation, the Due Process Clause of the Fifth Amendment limits the district court's discretion with respect to the procedures used before appointing a guardian ad litem. *See Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Thomas v. Humfield*, 916 F.2d 1032, 1033–34 (5th Cir.1990). To determine the amount of process due, we must weigh (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of that interest through the procedures used, and the probable value of additional or different procedural safeguards; and (3) the government's interest. *See Abdullah v. I.N.S.*, 184 F.3d 158, 164 (2d Cir.1999) (citing *Mathews*, 424 U.S. at 334–35, 96 S.Ct. 893); *see also Gilbert v. Homar*, 520 U.S. 924, 931–32, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997). We consider these factors bearing in mind the particular context of the decision to appoint a guardian ad litem. *See Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593,· 33 L.Ed.2d 484 (1972) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands.").

■ Neilson argues that the district court was required to hold a formal, evidentiary hearing before appointing a guardian ad litem, and that it was required to provide her with a copy of Dr. Pulver's report prior to that hearing. In proposing these additional safeguards, Neilson analogizes her case to *Thomas v. Humfield*, 916 F.2d 1032 (5th Cir.1990). In that case, the court reversed the district court's dismissal of the case after appointing a guardian ad litem on the ground that the court's failure to afford the plaintiff an opportunity to review the psychiatric reports or to argue or present evidence on the the need for a guardian

for any reason other than death, the procedure prescribed in Rule 43(a) applies."); *id.* 43(a)(2) ("If a party entitled to appeal dies before filing a notice of appeal, the decedent's personal representative … may file a notice of appeal within the time prescribed by these rules."). Moreover, the notice names both Kenny and Neilson. *See Billino v. Citibank, N.A.*, 123 F.3d 723, 725–26 (2d Cir.1997). The general guardian has failed to file a motion for substitution after filing the notice of appeal, but we are not thereby prevented from deciding this appeal. *See Ciccone v. Secretary of Dep't of HHS*, 861 F.2d 14, 15 n. 1 (2d Cir.1988) ("[A]lthough no motion for substitution has been filed in this Court, we may proceed to decide [the] appeal." (citing Fed. R.App. P. 43(a))). (*Ciccone* construed a prior version of Rule 43, but the subsequent changes were stylistic.)

violated the Due Process Clause. *See id.* at 1034. The analogy to *Thomas* is of distinctly limited utility to Neilson, because in *Thomas* the case was remanded for a new determination as to whether or not the plaintiff was incompetent and in need of a guardian, whereas Neilson, who is represented on appeal by her general guardian, does not contest her incompetence. The Fifth Circuit in *Thomas* emphasized that its holding did not "address a situation where a party is under an existing guardianship or has otherwise been judicially found to be incompetent." *Id.* at 1033 n. 1. More fundamentally, however, we conclude that neither of the safeguards proposed (the pre-appointment hearing or the furnishing of Dr. Pulver's report) is required by the Due Process Clause because of the availability of post-appointment review and because of Neilson's questionable competence at the time the decision was made.

### 1. Post–Appointment Safeguards

■ After appointing a guardian ad litem, a court maintains a continuing obligation to supervise the guardian ad litem's work. *See Dacanay v. Mendoza,* 573 F.2d 1075, 1079 (9th Cir.1978) ("It is the court's order approving the settlement that vests the guardian ad litem with the legal power to enforce the agreement."); *Noe v. True,* 507 F.2d 9, 12 (6th Cir.1974) ("through a guardian ad litem the court itself assumes ultimate responsibility for determinations made on behalf of the [ward]"). The court may remove the guardian ad litem, *see Hull v. United States,* 53 F.3d 1125, 1127 n. 1 (10th Cir.1995) (noting that parties seeking to challenge the decisions of a guardian ad litem have a remedy of applying to the court to have the guardian ad litem removed); *Garrick v. Weaver,* 888 F.2d 687, 693 (10th Cir.1989) (denying standing to legal representative after appointment of a guardian ad litem, reasoning that proper remedy is to petition the court for removal), or choose not to approve the guardian ad litem's proposals, *see Dacanay,* 573 F.2d at 1079.

The record in this case reveals that the district court carefully reviewed Niss's work and only approved his proposed settlement after making an independent finding that it was fair. *See Neilson,* 993 F.Supp. at 228. The district court also entertained requests made by Neilson and by counsel for her son to have Niss removed as guardian ad litem. Because the district court examined Neilson's case after Niss's appointment and had opportunities to remove Niss as guardian ad litem, we believe that dispensing with a formal hearing prior to appointing a guardian ad litem presents only a small risk of an erroneous deprivation. *See Reeve Aleutian Airways, Inc. v. United States,* 982 F.2d 594, 600 (D.C.Cir.1993) (finding risk of erroneous deprivation to be minimal when individual suffering deprivation had opportunity for follow-up contact with the decisionmaker) (citing *Gray Panthers v. Schweiker,* 652 F.2d 146, 169 (D.C.Cir. 1980)); *see also Gilbert v. Homar,* 520 U.S. at 932, 117 S.Ct. 1807 (explaining that temporary deprivations subject to post-deprivation review require fewer pre-deprivation protections).

### 2. Neilson's Incompetence

At the time the district court was considering the appointment of a guardian ad litem, a genuine question existed as to Neilson's competence. We believe that it was reasonable for the district court, in that circumstance, to decide that there would be little probable value to a formal, adversary hearing. *See Goldberg v. Kelly,* 397 U.S. 254, 268–69, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) ("The opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard."); *Gray Panthers v. Schweiker,* 652 F.2d 146, 166 (D.C.Cir.1980) (explaining that adequacy of process is determined "with reference to the characteristics of the group who have to use it").

■ We recognize, of course, that "particularly extensive efforts to provide

notice may often be required when the State is aware of a party's inexperience or incompetence." *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 799, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983) (citing *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 13–15, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978); *Covey v. Town of Somers*, 351 U.S. 141, 146–47, 76 S.Ct. 724, 100 L.Ed. 1021 (1956)). But those "extensive efforts" are only required when there is some likelihood that they would be more effective than the procedures actually used. In *Memphis Light*, the Court required a utility company to explain the procedures available for challenging a bill in a way that could be understood by the company's uneducated, inexperienced customers. *See Memphis Light*, 436 U.S. at 14 n. 15, 98 S.Ct. 1554. In the circumstances of this case, however, it was reasonable for the district court to conclude that, given Neilson's mental state, there was no way it could provide an explanation that would have been suited to her condition. In *Covey*, the Court found notice of a foreclosure by publication in a newspaper to be unconstitutional with respect to a known incompetent. *See Covey*, 351 U.S. at 146–47, 76 S.Ct. 724. But Judge Rakoff's procedure in this case was far more protective of Neilson's interests than mere publication of notice in a newspaper. The district court informed Neilson by written order that it was considering appointing a guardian ad litem and ordered an examination by an independent psychological expert. The district court weighed the expert's report, its own interactions with Neilson, as well as the documentary evidence before finally deciding that a guardian ad litem should be appointed.

Moreover, the district court considered conducting a hearing and only dispensed with it upon concluding that the submissions of the parties rendered it unnecessary. *See von Bulow, by Auersperg v. von Bulow*, 634 F.Supp. 1284, 1296 (S.D.N.Y. 1986) (dispensing with hearing prior to appointment of "next friend" on ground that facts submitted to the court were sufficient to establish need for appointment).[5]

■ The enduring lesson of *Memphis Light* and *Covey* is that, when considering whether notice is "reasonably calculated, under all the circumstances" to inform the recipient of the nature of pending proceedings, *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950), the mental capacity of the recipient is one of the circumstances to be considered. We believe that in light of the genuine question that existed as to Neilson's competence, the notice (as well as other procedures) chosen by Judge Rakoff was reasonable and, therefore, did not violate the Due Process Clause. This is not to say that Judge Rakoff committed an error which was harmless in light of Neilson's incompetence, but that Judge Rakoff's personal observation of Neilson and his experience with her inconsistencies were such that the district court's notice was reasonable and was therefore not erroneous.

For these reasons, we believe that neither providing Neilson with a copy of Dr. Pulver's report nor providing more elaborate notice would have been of significant probable value in protecting Neilson's interests and that no worthwhile purpose would have been served by conducting a formal, evidentiary hearing. On the other

5. The district court relied heavily upon a finding that Neilson consented to the appointment of a guardian ad litem. *See Neilson*, 993 F.Supp. at 226. The authors of this opinion disagree as to the import of Neilson's consent. Judge Sand has grave doubt as to the effectiveness of Neilson's consent. Judge Jacobs would have affirmed on the following grounds: First, it cannot be assumed that a person with a mental disability necessarily lacks appreciation of her impairment or the capacity in lucid times to form opinions and contribute to decisions about what kind of help is needed. Second, the district judge had the opportunity to draw conclusions on this point on the basis of his own observations. In any event, the other considerations upon which the district court relied are adequate to support the validity of its procedure.

hand, to require the district court to conduct a formal, evidentiary hearing before appointing a guardian ad litem would consume a significant amount of judicial resources, cause delay, and accomplish little. Balancing these factors, we conclude that the risk of erroneous deprivation was low, given the procedures used by the district court, and that the probable value of the proposed additional procedures was limited. Although we find Neilson's interests to be compelling, we do not believe the proposed additional safeguards would have offered sufficient protection of those interests as to justify another additional delay not only to the court system but to the furnishing of a remedy to Neilson, who was in need of immediate relief. *See infra* at 657. The Due Process Clause does not, therefore, require the district court to have used the proposed procedures before finding Neilson incompetent and appointing a guardian ad litem.

## C. The Approval of the Settlement

▉▉▉▉ In *Maywalt v. Parker & Parsley Petroleum Co.,* 67 F.3d 1072, 1078 (2d Cir.1995), we held that a district court's decision to approve the settlement of a class action is reviewed for abuse of discretion. Among other reasons, we emphasized that the district court bears the "ultimate responsibility" for ensuring that the interests of vulnerable class members are vindicated and that the district court enjoys a "familiarity ... with the proceedings, the parties, and the performance of counsel." *Id.* Those same considerations militate in favor of applying an abuse of discretion standard to a district court's decision to approve the compromise of an incompetent's claims, and we therefore do so here. *See Dacanay v. Mendoza,* 573 F.2d 1075, 1079 (9th Cir.1978) ("It is an ancient precept of Anglo–American jurisprudence that infant and other incompetent parties are wards of any court called upon to measure and weigh their inter-

ests."). In exercising its discretion, the district court's focus is to "determin[e] whether a proposed settlement is fair, reasonable, and adequate," by comparing "the terms of the compromise with the likely rewards of litigation." *Maywalt,* 67 F.3d at 1079 (citations and internal quotation marks omitted).

▉▉▉ We do not find that the district court abused its discretion in determining that the settlement negotiated by Niss was fair, reasonable, and adequate when compared to Neilson's likely recovery were she to have proceeded to trial. We believe that Neilson's frequent inconsistencies and well-established paranoia would have created substantial obstacles for her at trial, including the risk that she would be unable to testify, or to do so with the necessary lucidity, or to cope with cross-examination. But even were we to grant, as Neilson urges, that Neilson might have overcome those obstacles either through the presentation of deposition testimony or by relying on statements made by Michelle Mayes of Colgate's Human Resources Department in support of her retaliation claim, we nevertheless believe that the totality of the circumstances justifies the district court's approval of the settlement. Assuming Neilson could prevail at trial, any recovery that she would receive would necessarily be delayed at least until a trial could be completed. Moreover, in calculating damages, the jury would be aware of Neilson's mental disorder and of its early onset; those facts would certainly limit any potential recovery for lost wages and might diminish other forms of recovery as well. In view of these limited prospects for recovery from litigation, it was within the district court's discretion to conclude that a settlement promising certain, immediate recovery of lifetime health care benefits and a pension income of approximately $30,000 per year was "fair, reasonable, and adequate." [6]

---

6. The dissent (at 665) characterizes Neilson's case as one that a lawyer would "leap" at,

and notes (at 666 n.9) that one firm is willing "to forego fees for the remainder of the case,"

Neilson also challenges the settlement on the ground that, wholly apart from the question of fairness, its approval was infected by procedural error. Neilson cites the Southern District's Local Rule 83.2(a)(1): "The proceeding upon an application to settle or compromise ... an action [by or on behalf of an incompetent] shall conform, as nearly as may be, to the New York State statutes and rules, but the court, for cause shown, may dispense with any New York State requirement." S.D.N.Y. R. 83.2(a)(1). By virtue of that local rule, Neilson argues, the district court was obliged to withhold settlement approval until Niss filed an affidavit containing all of the information required by § 1208 of the New York Civil Practice Law and Rules. *See* N.Y. C.P.L.R. § 1208 (McKinney 1997).

CPLR § 1208 requires that a proposed settlement of an incompetent's action be accompanied by an affidavit from the incompetent's representative providing eight pieces of information. *See id.* at § 1208(a). It is undisputed that Niss's affidavit provided sufficient information with respect to five of those pieces of information—the name, age, and residence of the guardian and the ward, the circumstances giving rise to the action, the terms and proposed distribution of the settlement, and the facts surrounding any other motion or petition for settlement of the same claim. Neilson claims that Niss failed to provide the remaining three pieces of information: (1) the nature and extent of damages sustained by the incompetent; (2) whether reimbursement for medical or other expenses has been received from another source; and (3) whether a member of the incompetent's family is asserting a claim.

 Niss's affidavit does, however, reflect the conclusion that Neilson "had no viable case under the civil-rights laws."

Niss also provides an analysis of a potential disability claim that he believed Neilson possessed. When Neilson argues that Niss failed to include a description of the nature and extent of damages suffered by the incompetent, then, it seems that she is actually just expressing her disagreement with Niss's conclusions. We find, therefore, that Niss did provide information regarding "the nature and extent of the damages sustained by the ... incompetent." *Id.* at § 1208(a)(4). However, we agree with Neilson that Niss failed to include a statement about reimbursement or information regarding claims by Neilson's family members. But these failures do not require this Court to vacate the district court's approval of the settlement.

Rule 83.2 is hardly a rigid obligation imposed on district courts. The rule provides that "the court, for cause shown, may dispense with any New York State requirement" and that the court should follow the state procedure "as nearly as may be." S.D.N.Y. R. 83.2(a)(1). Judge Rakoff explained that he was impressed by how quickly the federal guardian ad litem had been able to negotiate a favorable settlement for a plaintiff who had been denied relief for over four years. He also repeatedly expressed the particular need to resolve matters expeditiously given Neilson's frequent complaints that no one was trying to help her. Judge Rakoff attributed Niss's success to "the swifter processes accorded under federal law to appoint a guardian ad litem unhindered by the limitations sometimes imposed by state law." The district court then explicitly indicated that the need for these "swifter processes" was a "good cause" that had been "shown" for dispensing with state procedures and, on that basis, dispensed with them. That decision was not an abuse of discretion.

and expresses puzzlement therefore at "the district court's suggestion, echoed by the majority, [citation omitted] that counsel was motivated only by a desire to recoup her fees." As it happens, that firm was once Neilson's counsel of record on this case, and withdrew.

Forswearing all fees for the *"remainder* of the case" does not of course mean that counsel would not collect, from any alternative settlement, fees for services *previously* rendered in the case. As to the motives of counsel, we have no view.

While there appears to be some authority indicating that, as a matter of state law, failure to comply with § 1208 is grounds for refusing to approve a settlement, Neilson cites no authority establishing that a federal court applying Rule 83.2 is required to reject any settlement that is not compliant with CPLR § 1208 in every particular.

### D. The Refusal to Delay Approval of the Settlement

■ Neilson's final argument is that the district court erroneously refused to delay its consideration of the settlement pending a ruling in state court on the application by Neilson's son for appointment of a general guardian.

Neilson's argument involves the interaction between Federal Rule of Civil Procedure 17(b) and § 1207 of the New York Civil Practice Law and Rules. The federal rule requires that a court determine capacity to sue by reference to the law of an individual's domicile. *See* Fed.R.Civ.P. 17(b). The state rule provides that approval of a settlement must be sought by a general guardian rather than by a guardian ad litem. *See* N.Y. C.P.L.R. § 1207 (McKinney 1997); *see also Tudorov v. Collazo*, 215 A.D.2d 750, 627 N.Y.S.2d 419, 419–20 (2d Dep't 1995) (reversing Supreme Court's grant of guardian ad litem's motion to settle on ground that "a guardian ad litem is not authorized to apply to the court for approval of a proposed settlement of a party's claim"). Neilson argues that the district court was required under Rule 17(b) to adhere to the state rule and await appointment of the general guardian.

It is not clear that the limitation embodied in § 1207 relates to capacity. *See Bryant v. Riddle*, 259 A.D.2d 399, 687 N.Y.S.2d 108, 109 (1st Dep't 1999) (Mem.) (stating that under New York law, "a person of unsound mind but not judicially declared incompetent may sue or be sued in the same manner as any other person" (citing *Sengstack v. Sengstack*, 4 N.Y.2d 502, 176 N.Y.S.2d 337, 341–42, 151 N.E.2d

887 (1958))). But assuming that it does, we conclude that the district court was not obligated to apply it, because "insofar as state law might be read to preclude the federal court from exercising its appointive power under Rule 17(c), it must give way, Rule 17(b) notwithstanding." 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1571, at 511 (2d ed.1990).

■ Neilson argues in the alternative that the district court should have delayed settlement approval because, even if the court was not *required* to await the appointment of the general guardian, it should have respected the "strong preference" for representation by a general guardian expressed in both federal and state law. Neilson points to Federal Rule of Civil Procedure 17(c), which provides for representation of an incompetent by a guardian ad litem only in the absence of a general guardian. *See* Fed.R.Civ.P. 17(c) ("Whenever an ... incompetent person has a representative, such as a general guardian, committee, conservator, or other like fiduciary, the representative may sue or defend on behalf of the ... incompetent person. An ... incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem."). For a similar preference in state law, Neilson relies on *In re Legget's Trust*, 25 A.D.2d 727, 268 N.Y.S.2d 911 (1st Dep't 1966), in which the Appellate Division reversed the trial court's appointment of a guardian ad litem in part because, at the time of the appointment, the court "was aware that the appellant had a general guardian." *Id.* 268 N.Y.S.2d at 913. Neilson also cites the limitation, embodied in § 1207, on a guardian ad litem's ability to apply to a court for approval of a settlement.

Federal and state law defer to a general guardian *where such guardian has already been appointed.* At the same time, where a general guardian has *not* been appointed, such a preference would be inconsistent with Rule 17(c), which is struc-

tured as it is in order to allow a district court to ensure—through the appointment of a guardian ad litem—that a lawsuit by or against an incompetent can proceed notwithstanding the state court's failure to appoint a general guardian.[7] *Cf.* 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *supra,* § 1571, at 511.

 Once a district court that has already appointed a guardian ad litem for a litigant is informed of the impending appointment of a general guardian, the prudential question of whether to delay the course of the lawsuit pending arrival of the general guardian is addressed to the court's sound discretion. *Cf. County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1322–23 (2d Cir.1990) (reviewing for abuse of discretion district court's refusal to allow party to participate in settlement of class action where participation would cause delay in course of lawsuit). We see no abuse of discretion here.

Neilson suggests that delay was needed because the general guardian—"who has responsibility for all of [her] affairs"— would have had the ability to determine whether the settlement best served her particular needs. No doubt, a district court would do well to ascertain the views of a general guardian if possible, but the district court was free to weigh that advantage against circumstances that militated against delay.

The awaiting of the general guardian entailed a potentially long delay. Torres represented to the district court that, although the state court had decided to appoint a general guardian, it had yet to select someone to serve in that position, and that after selection, the general guardian would have to be qualified and bonded. Torres further conceded that the new general guardian could not be expected to weigh in on the proposed settlement without first "review[ing] what has transpired in federal court, review[ing] the settlement, and also analyz[ing] [Neilson's] financial situation." The adjournment sought by Neilson's son was therefore open-ended. Although we know now that the general guardian was appointed less than two weeks after the settlement was approved, that fact is available to us only through hindsight. When Judge Rakoff approved the settlement it was reasonable to anticipate a significant delay before a general guardian would be in position to advocate Neilson's interests. In the meantime, as the district court appreciated, *see Neilson,* 993 F.Supp. at 227–28, there was an offer on the table, and Neilson—who was evidently unable to work as an accountant—was, according to Dr. Pulver, apparently "living on financial handouts from friends and relatives" and "not eating regularly." Judge Rakoff's decision to proceed was an entirely reasonable assessment of the circumstances and of Neilson's needs.

Other than to suggest that her "values and wishes" would have been better served by a different result, Neilson has pointed to no particular interest that would have been better served had Niss (or a general guardian) taken a different course. Instead, acting through the Vladeck firm, she challenges Niss's view of the merits of Neilson's remaining claims. But the district court, which was presented with both views, concurred with Niss's evaluation of those claims, and rejected as "conclusory, self-serving, and unreliable the claims by the Vladeck firm that the plaintiff they successfully sought leave to abandon actually has a good case (good enough, that is, to warrant their asserting a lien for attorneys' fees)." *Neilson,* 993 F.Supp. at 228 n. 4. On this record, we see no reason to second guess that determination.

---

7. Nor was the district court required by local rule to enforce § 1207's limitations. *See* S.D.N.Y. R. 83.2(a)(1) ("The proceedings upon an application to settle or compromise ... an action [by or on behalf of an incompe-

tent] shall conform, *as nearly as may be,* to the New York State statutes and rules, *but the court, for cause shown, may dispense with any New York State requirement."* (emphasis added)).

## CONCLUSION

For the reasons set forth above, the judgment of the district court is affirmed.

SOTOMAYOR, Circuit Judge, dissenting:

It is no easy task for a district court to manage its docket efficiently, particularly when confronted with a litigant who is suffering from mental or emotional problems. I therefore have little difficulty understanding the district court's apparent desire to bring this case to a speedy conclusion that assured Neilson a comfortable settlement. No matter how well intentioned, however, the district court's desire for a quick and a seemingly fair resolution of this litigation could not and does not displace Neilson's fundamental rights under the Constitution. In my view, the district court failed to give Neilson even the most basic notice before appointing a guardian ad litem who then assumed full control over her case. Because I believe this failure amounted to a denial of due process of law, I respectfully dissent.[1]

## I. Due Process

As the majority acknowledges, Neilson had a due process right to notice and an opportunity to be heard before the district court could appoint a guardian ad litem on her behalf. *See, e.g., Thomas v. Humfield,* 916 F.2d 1032, 1033–34 (5th Cir.1990) (holding that a party to litigation "doubtless ha[s] a protected liberty interest in pursuing the suit as a principal [and safeguarding his] good name, reputation, honor, or integrity," and is therefore entitled to notice and a hearing before the court declares him incompetent and appoints a guardian ad litem) (citation and internal quotation marks omitted). From this basic proposition, however, the majority takes an extraordinary leap. In holding that the district court adequately notified Neilson of the pending competency proceedings in this case, the majority adopts the astonishing position that a mentally ill individual is entitled to less, rather than more, notice based on her illness. In my opinion, this conclusion turns the due process principle of "notice and opportunity to be heard" on its head.

The majority begins with the fundamental rule that "[t]he opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard." *Goldberg v. Kelly,* 397 U.S. 254, 268–69, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). It concludes from this rule that when a litigant's mental capacity is limited, the district court may neglect its duty to provide adequate notice because any effort to do so would be futile. Neither *Goldberg* nor the other cases on which the majority relies, however, support this conclusion. On the contrary, the cases the majority cites stand uniformly for the proposition that when a party exhibits a limited ability to understand a proceeding affecting her rights, the court must undertake even more strenuous efforts to explain the process and give the party a meaningful opportunity to respond. *See id.* at 268–69, 90 S.Ct. 1011 (holding that written objections to the deprivation of welfare benefits did not provide uneducated and unrepresented welfare recipients with an adequate opportunity to be heard); *Covey v. Town of Somers,* 351 U.S. 141, 145–47, 76 S.Ct. 724, 100 L.Ed. 1021 (1956) (holding that notice measures "deemed sufficient in the case of the ordinary taxpayer" did not suffice as applied to a "known incompetent"); *Gray Panthers v. Schweiker,* 652 F.2d 146, 169 (D.C.Cir.1980) (holding, in the context of the denial of Medicare benefits, that because "the elderly, as a group, are less able than the general populace to deal effectively with legal notices and written registration requirements," additional methods of notice were required); *cf. Mennonite Bd. of Missions v. Adams,* 462 U.S. 791, 799–800, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983) (holding that notice of

---

1. I concur in Part A of the majority's discussion, which holds that Neilson's general guardian has standing to bring this appeal. *See ante* at 650–51.

sale mailed to a property owner was not "reasonably calculated" to inform the mortgagee of the sale).

These cases simply reflect the rule that "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). It follows that in giving notice "reasonably calculated" to inform a mentally ill litigant, a court must go to greater lengths than would be necessary in the ordinary case. The majority, however, draws the opposite conclusion that when a litigant's mental capacity renders her unable to comprehend ordinary notice procedures, the court may dispense with notice altogether.

I cannot agree with this proposition as a general matter, nor can I agree that the district court gave Neilson adequate notice in this case. Although sufficient notice and opportunity to be heard would not necessarily have required a formal evidentiary hearing, as Neilson urges, it would at a minimum have required that Neilson be informed that she had a liberty interest at stake: specifically, that if she was found incompetent and a guardian ad litem was appointed, she would lose all authority to make decisions concerning her own case. *Cf.* N.Y. Mental Hyg. Law § 81.07(c) (McKinney 1996) (requiring applicant for general guardian to give allegedly incompetent person specific written notice that applicant "believes you may be unable to take care of your personal needs or financial affairs," and is seeking appointment of "someone ... to make decisions for you"); Law Revision Commission Comments on § 81.07 ("The notice must include a legend which describes the nature and seriousness of the proceeding and the person's right to due process.").

Although the majority concludes that Neilson received adequate notice here, it fails to identify a single communication from the district court alerting Neilson to the significance of the pending competency determination. In fact, there were no such communications. The district court's August 15, 1997 order requiring Neilson to submit to a psychiatric examination certainly does not qualify as such notice, as it did not contain, nor was it accompanied by, any explanation of the possible implications of the examination or the legal repercussions of a guardian ad litem appointment. The court's September 10, 1997 order was similarly deficient. That order simply scheduled a hearing to consider Dr. Pulver's recommendation that a guardian ad litem be appointed, and directed that "if the plaintiff consents to the appointment of a guardian ad litem, she should submit ... a written declaration giving such consent." Nor did the district court explain the nature and import of a guardianship ad litem either during the July status conference at which Colgate first questioned Neilson's competency or during the September proceeding at which the court appointed the guardian.

The majority nonetheless concludes that the district court adequately protected Neilson's interests by 1) informing Neilson that it was considering appointing a guardian ad litem; and 2) ordering an independent psychological examination. *See ante* at 653. Neither of these measures, however, even approaches sufficient notice under the Due Process Clause. As a *pro se* litigant, Neilson could hardly have been expected to understand the meaning and effect of a guardianship ad litem absent an explanation of the role the guardian would play in directing the case, which the district court did not provide. Nor did the mere fact of the psychological examination constitute adequate notice. Nothing in the examination itself was calculated to educate Neilson regarding the legal consequences of a guardianship ad litem, and Neilson did not even receive a copy of the resulting expert report until sometime in

December 1997, nearly three months after the court appointed the guardian ad litem. As a result, Neilson had no opportunity to challenge Dr. Pulver's observations or object to his conclusions.

The court compounded the inadequacy of this notice, moreover, by improperly leading Neilson to believe that her case would be dismissed with prejudice if she refused to consent to the psychiatric examination and to the guardian ad litem appointment. The district court first raised the possibility of dismissal in its August 15, 1997 order, which unequivocally stated that Neilson's case would be dismissed with prejudice unless she submitted to a psychiatric examination. Neilson immediately wrote the court a letter pointing out that the case cited in the order, *Krain v. Smallwood*, 880 F.2d 1119 (9th Cir.1989), in fact held that a court could *not* dismiss a case with prejudice based on a *pro se* plaintiff's failure to comply with an order under Fed.R.Civ.P. 35(a), *id.* at 1121.[2] The court did not respond to Neilson's letter, thereby suggesting that it adhered to the threat of dismissal contained in the August 15 order notwithstanding the incorrect citation of *Krain.* This failure to respond, which left Neilson with a clear misconception regarding the probable consequences of withholding her consent to the examination, falls far short of notice "reasonably calculated to inform" her of the nature of the proceedings.

As would be expected given the court's threat of dismissal, Neilson submitted to the examination. One week later, the court issued a second order scheduling a hearing to consider the appointment of a guardian ad litem and again inviting Neilson's consent. Although the second order did not explicitly state that Neilson's case would be dismissed with prejudice if she withheld her consent, it was both proximate in time to and concerned the same subject matter (Neilson's competency) as

the first order. Even Colgate, from the time it first questioned Neilson's competency, linked its request for a psychiatric examination under Fed.R.Civ.P. 35(a) to the prospect of a guardianship ad litem under Fed.R.Civ.P. 17(c). Neilson, proceeding without counsel, reasonably could have inferred that the court's threat of dismissal in the first order applied to the second order as well, and that she therefore had no choice but to consent to the appointment of a guardian ad litem. In fact, Neilson herself informed the court just one week after the appointment that she consented "[f]or fear of having the case dismissed." The court did not attempt to correct Neilson's misimpression that the court could dismiss her case with prejudice, or to ensure that Neilson understood her right to refuse consent to the appointment of a guardian ad litem. The district court's failure in this regard further illustrates that its notice procedures were not tailored to Neilson's capacity and circumstances.

Given the sparse notice she received, it is not surprising that Neilson's communications to the district court revealed considerable confusion as to the significance of the psychiatric examination and the guardian ad litem appointment. In fact, the record is abundantly clear that Neilson, proceeding without counsel, was operating under the mistaken belief that the court was contemplating appointing an attorney—not a legal guardian—on her behalf. Repeatedly, Neilson emphasized to the court that she was competent "to make rational decisions," but not to act as her own counsel. *See, e.g,* Letter from Francine Neilson to Court dated July 31, 1997 ("Because Neilson is sufficiently competent to make rational decisions does not mean that she is also sufficiently competent to act in the capacity of an attorney before the court, to be ProSe.") Read in context, Neilson's statements to the effect that she

---

2. Even Colgate does not attempt to defend the propriety of the district court's August 15 order.

was not "competent" to litigate the case plainly referred to her legal rather than mental capacity. *See, e.g., id.* (noting that "Webster's dictionary [defines] competency [as] to meet or to be sufficient; efficient; sufficient skills or training to do something; legally capable," and arguing that "Neilson does not have sufficient skills and training to meet the needs of plaintiff in this case"). On several occasions, moreover, Neilson specifically asked the court to appoint an attorney to represent her. *See, e.g.,* Letter from Francine Neilson to Court dated August 28, 1997.[3]

Indeed, as soon as Neilson became aware that her recently appointed guardian ad litem would have full control over the litigation, she immediately protested the appointment. *See* Letter from Francine Neilson to Court dated September 25, 1997 ("Ms. Neilson has stated to the Court that she is competent to handle day to day decisions but not competent to litigate her case, which was the initial issue of appointing an ad litem, her ability to continue to litigate the case, being ProSe. Plaintiff needs to have Mr. Niss' role clarified and also what her options are which are to be determined by the discretionary powers to be used by the Court on her behalf."). Thereafter, she repeatedly asserted her competency and objected to the guardian ad litem appointment, both in writing and at each and every court proceeding held in this matter. *See* Transcript of October 27, 1997 Proceeding ("Mr. Niss is telling me that he can do anything he wants to do because he is the guardian ad litem and I'm adjudicated incompetent. Well, I'm far from incompetent. I'm incompetent to litigate, but I'm certainly competent enough to handle my day-to-day af-

fairs...."); Transcript of November 25, 1997 Proceeding ("As I indicated to you when I had to respond to your request on the August 15th order for going for psychiatric evaluation to determine whether or not I was competent to litigate the case, that, no, I was not competent to litigate the case, I tell you that right out. I'm not an attorney.... And I pleaded to you, during that time, assign a litigator. I need a litigator. If the ad litem is going to be a litigator, that's what I need. When I was told that Mr. Niss was an attorney, I assumed that he was going to be the litigator. Mr. Niss has a different idea totally.... The last time I spoke to Mr. Niss was yesterday he told me that he's still waiting to hear from finalizing some issues on the settlement that he proposed. He had made it very clear to me that what he proposed, whether I like it or not, has to be accepted by me because he's the ad litem. You know, I'm not mentally deficient where I need an ad litem or someone to tell me what I need to do and how I need to run my life.... I plead and I beg to you one more time, your Honor, please give me a litigator, assign to me a litigator who is willing to take on this case."); Letter from Francine Neilson to Court dated December 27, 1997 re: Inability to Obtain a Fair and Impartial Trial—Removal of Ad Litem ("Pro se plaintiff requests removal of Guardian Ad Litem, James Niss, because of his apparent lack of independence, insensitivity to needs of plaintiff, disregard of Court instructions regarding the handling of his responsibilities.... All of this leaves plaintiff without legal representation in the litigation matters, resulting in her continuing to represent herself in legal matters, thus remaining a pro se plain-

---

**3.** Some of Neilson's initial comments to the court referred to a guardian ad litem and an attorney conjunctively. *See, e.g.,* Letter from Francine Neilson to Court dated September 15, 1997 ("I again consent to the appointment of a guardian ad litem in addition to an attorney....."). Viewed in its entirety, however, the record demonstrates that Neilson perceived no distinction between a guardian ad litem and a lawyer who would litigate her

case. *See, e.g.,* Transcript of October 27, 1997 Proceeding ("He's not acting as a guardian ad litem. I do not need a guardian for day-to-day affairs. I need someone to litigate the case."); Transcript of November 25, 1997 Proceeding ("I still have to go back to the issue that we initially asked for an ad litem, a guardian ad litem, for powers of litigating this case. That's why I consented to it. No other reason. For litigating this case.").

tiff."); Transcript of January 6, 1998 Proceeding ("Mr. Niss ... was appointed guardian ad litem in the broader sense. He was appointed guardian ad litem to assist because I needed assistance in litigation. He is not litigating. He has no intention of litigating."); Transcript of January 28, 1998 Proceeding ("I consented to having the ad litem who would be the litigator to this case in trial, not to sit there and start to make a disability claim to say Mrs. Neilson was impaired, you know.... But I did ask that if there was doubt as to what my intent was when I agreed to have an ad litem, then I withdraw that approval and I request that Mr. Niss be removed from serving as my ad litem. I did that over six weeks ago to this court. And I did not get a response to that.").

All things considered, Neilson was hardly erratic in her representations concerning her competency. To the contrary, after an initial period of understandable confusion triggered by inadequate notice, Neilson emphatically and consistently challenged the district court's guardian ad litem appointment. This course of conduct cannot seriously be characterized as informed "consent," *see Neilson v. Colgate–Palmolive Co.*, 993 F.Supp. 225, 226 (S.D.N.Y.1998), and the majority correctly declines to affirm the district court's appointment of the guardian ad litem on this convenient but unsupported basis. *See ante* at 653 n. 5.

The manner in which the majority does dispose of Neilson's appeal, however, is even more problematic. Even apart from its unprecedented approach to the question of notice, in the end the majority's analysis—its own characterization to the contrary, *see ante* at 653, notwithstanding—amounts to harmless error review. By relying on the district court's "post-appointment safeguards" to compensate for its pre-appointment due process deficiencies, the majority treats those deficiencies as harmless in light of the overall fairness of the settlement. Moreover, in using

Neilson's now-uncontested incompetence to justify the district court's failure to give her proper notice, the majority in essence holds that any error below was harmless because proper notice would have been ineffective in light of Neilson's mental state.

As the majority appears to concede, however, it is highly doubtful whether a court's failure to provide sufficient notice and an opportunity to be heard before appointing a guardian ad litem is subject to harmless error review. *See, e.g., WJR, The Goodwill Station v. Federal Communications Comm'n*, 174 F.2d 226, 241 (D.C.Cir.1948) ("Denial of a procedural right guaranteed by the Constitution—in this instance denial of a hearing guaranteed by the due process clause—is never 'harmless error.' "), *rev'd on other grounds*, 337 U.S. 265, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949); *cf. Kim v. Hurston*, 182 F.3d 113, 119 (2d Cir.1999) (reversing judgment as a matter of law in favor of defendant and remanding for entry of nominal damages award, reasoning that even though "the minimal hearing that procedural due process requires would have done [the plaintiff] little good since she could not have realistically contested [the ground for deprivation of her liberty interest] ... [,] the procedural due process requirement ... must be observed"). Accordingly, the district court's post-appointment efforts to monitor the work of the guardian ad litem are irrelevant to the determination of whether its pre-appointment notice to Neilson was adequate. The due process right to notice and opportunity to be heard is wholly independent of the guardian ad litem's duty to protect a litigant's interests. Consequently, not even the most diligent and capable guardian ad litem can compensate for an unlawful deprivation of a party's right to be fully informed before she loses control of her case.

Even if harmless error analysis is appropriate, the district court's denial of due process in this case was not harmless.

The evidence simply does not support the majority's conclusion that "there was no way [the district court] could provide an explanation that would have been suited to [Neilson's] mental condition." *Ante* at 652. At the very least, the consistent and detailed manner in which Neilson objected to the guardian ad litem once she became aware of his function suggests that she was far from unable to understand or protect her right to pursue her own case. Had Neilson received timely and adequate notice of the nature of the proceedings going on around her, she might well have refused either to submit to the psychiatric examination or to consent to the appointment of a guardian ad litem, thereby potentially inviting a dismissal without prejudice. *Cf. Krain*, 880 F.2d at 1121 (noting that when a *pro se* litigant refuses to cooperate in competency proceedings, the court may dismiss the case without prejudice). Alternatively, given a meaningful opportunity to be heard, Neilson might have convinced the district court to appoint an attorney for her rather than a guardian ad litem. *Cf. id.* (specifying appointment of an attorney as an alternative to holding competency proceedings or dismissing the case without prejudice). Had she undertaken either of these actions, it is at least possible that Neilson, with the assistance of her general guardian and her family[4], would have been able to continue litigating

her case or to refile her claims later and either try them successfully or negotiate a more favorable settlement. *See infra* Part II.B.

In sum, the district court's decision to divest Neilson of authority over her own case violated her due process rights. With such an important constitutional interest at stake, the district court had the responsibility to provide Neilson with notice that was tailored to her mental capacity and designed to ensure that she understood the course her case was taking. The record simply does not support the majority's conclusion that such notice would have been futile due to Neilson's incompetence, nor do the district court's "post-appointment safeguards" mitigate the inadequacy of the notice she did receive. I therefore reject the majority's holding and vote to vacate the judgment and remand the case to allow Neilson's general guardian to proceed with the lawsuit.

## II. *Refusal to Defer Consideration of Proposed Settlement*

For the reasons explained, I fear that the district court, in its haste to conclude this matter, took a shortcut where Neilson's due process rights were concerned. The point is underscored by the district court's subsequent decision to approve the

**4.** I note that under New York law, copies of an application for a general guardian must, if possible, be served on the allegedly incompetent person's spouse, parents and adult children, among others. *See* N.Y. Mental Hyg. Law § 81.07(d)(ii). Although the precise procedure for appointing a guardian ad litem is left to the district court's discretion under Fed.R.Civ.P. 17(c), *see Thomas*, 916 F.2d at 1035 (holding that district court "may apply any procedure [for determining competency] that meets the requirements of due process"), there is no reason why a district court should not attempt to follow the state procedures, where possible, for notifying the individual's family. The state procedures for notice to families have a sound basis in logic and experience, and district courts should use them as a guideline for competency proceedings in federal court. Asking an allegedly incompetent party about his or her family, and attempting to obtain their names and addresses, are simple steps that courts can and should take before proceeding with the appointment of a guardian ad litem.

Had the court below taken these measures, this case might not have progressed to its current unfortunate state. Neilson's son, who commenced a state court proceeding to appoint a general guardian soon after the district court appointed the guardian ad litem, appears to have been both willing and able to help her oversee her affairs until a general guardian was appointed. Had Scott Neilson been apprised of the proceedings in federal court regarding his mother's competency, he might have been able to explain more fully the import of the competency proceedings to his mother and to assist her in deciding whether to consent to a psychiatric examination or to a guardianship ad litem.

proposed settlement rather than, as Scott Neilson requested, to defer consideration of the agreement pending the state court's imminent appointment of a general guardian for Neilson. The majority offers two justifications for this decision, both of which are exaggerated and neither of which is sufficient.

## A. Delay

The majority concludes that allowing Neilson's general guardian an opportunity to review the proposed settlement would have entailed considerable delay. *Ante* at 657. This concern finds no support in the record. Quite the contrary, Scott Neilson's attorney informed the district court, both in his affidavit and at oral argument, that the state court judge had decided to appoint a guardian, understood the need for prompt action and was likely to finalize the appointment within a matter of weeks.[5] Even the guardian ad litem expressed confidence that the state court judge would complete the process as soon as possible, observing that "the state court judge ha[d] moved like the wind." New York law, moreover, gives guardianship proceedings "a preference over all other causes" and imposes deadlines for the appointment and commission of general guardians. *See* N.Y. Mental Hyg. Law § 81.13.

The district court apparently viewed these facts as irrelevant, noting that Neilson's general guardian "would be required effectively to duplicate the efforts of the [g]uardian [a]d [l]item," who had by then spent more than four months working on the case, and anticipating "a delay of many months before the general guardian could give [her] evaluation of the proposed settlement." *Neilson*, 993 F.Supp. at 227. Initially, I cannot agree that obtaining the views of Neilson's general guardian would have involved "costly duplication" of the

guardian ad litem's efforts. *See id.* at 228. In contrast to a general guardian, who under New York law has broad powers and access to information about the incompetent party, *see* N.Y. Mental Hyg. Law §§ 81.21, 81.22, the guardian ad litem had very little interaction with Neilson and thus had virtually no first-hand knowledge of her personal situation or financial means. Indeed, throughout his involvement in this case, the guardian ad litem repeatedly indicated that he expected his role would be taken over by a general guardian. At one point, the guardian ad litem even joined in Scott Neilson's request for an adjournment. Although the guardian ad litem subsequently changed his position and opposed the adjournment, the record does not suggest that he had any new information concerning Neilson's personal or financial circumstances that might have cast doubt on the wisdom of his earlier recommendation that the court give the general guardian time to consider the proposed settlement.

The record similarly offers no basis for the district court's conclusion, apparently credited by the majority, *see ante* at 657, that Neilson's general guardian would require "many months" to review the proposed settlement. *See* 993 F.Supp. at 227. Much of the four months that the guardian ad litem spent on this case was devoted to negotiating and finalizing the settlement. As early as October 27, 1997, six weeks after he was appointed, the guardian ad litem was sufficiently familiar with the details of the case to report that "the prospects of settlement [we]re real, especially since Colgate's counsel and [he] [had begun] exploring the possib[ility] that Colgate's Disability Plan might provide an alternative to the relief sought in this lawsuit." The guardian ad litem later informed the court that only one-third of his

---

5. These representations proved accurate. Neilson's general guardian was appointed on February 27, 1998, just nine days after the district court issued its order approving the settlement and dismissing this action with

prejudice. The state court's order appointing the general guardian was entered in the New York County Clerk's Office on March 18, 1998, and her commission was issued on March 31, 1998.

time on this case was spent reviewing materials related to the merits of Neilson's claims. In any event, even without the benefit of this hindsight, *see ante* at 657, the district court easily could have taken steps to ensure against undue delay. The court could, for instance, have required the general guardian to submit an evaluation of the proposed settlement within a specific, limited period of time, *e.g.*, within 30 or 45 days. of her appointment and commission. The district court's failure even to explore such a possibility seriously undermines its conclusion that granting Scott Neilson's adjournment request would have led to "extended" delay. *See* 993 F.Supp. at 227.

The district court expressed concern that any delay in finalizing the settlement "would be highly prejudicial to plaintiff's interests, depriving her of much-needed benefits that would flow to her immediately under the settlement agreement." 993 F.Supp. at 227. Neither Neilson nor her son, however, shared this concern about "plaintiff's interests." Indeed, the court's trepidation should have been allayed at least somewhat by the fact that Neilson's son, who was taking appropriate legal steps to ensure his mother's long-term care, himself favored a brief adjournment. In any case, as Scott Neilson's attorney noted in his affidavit, the district court had before it virtually no information concerning Neilson's personal or financial resources, rendering its finding that Neilson needed "immediate" benefits wholly speculative.[6] What the majority characterizes as an "entirely reasonable assessment of the circumstances," *ante* at 657, thus appears to have been a conclusion based merely on a set of unsupported assumptions about Neilson's needs, hardly a sound basis for a decision with potentially momentous implications for Neilson.

**6.** Although the majority points to Dr. Pulver's report indicating that Neilson was apparently "living on financial handouts from friends and relatives" and "not eating regularly," *ante* at 657, the district court had no reason to believe that Neilson's basic subsistence needs were not being met, or were not likely

### B. *Neilson's Prospects at Trial*

The majority also affirms the district court's decision to approve the proposed settlement, without waiting for the general guardian to review the agreement, because Neilson had limited prospects for recovery at trial. *See ante* at 654–55, 657. Neither the district court nor the majority has, however, undertaken any detailed analysis of the merits of Neilson's claims, particularly her claim of retaliatory discharge. Federal courts, in determining the fairness of a proposed settlement, should consider a variety of factors, including "the range of reasonableness of the settlement fund in light of the best possible recovery." *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1323–24 (2d Cir.1990) (citation and quotation marks omitted); *see also Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir.1995) ("In determining whether a proposed settlement is fair, reasonable, and adequate, the primary concern is with the substantive terms of the settlement: Basic to this is the need to compare the terms of the compromise with the likely rewards of litigation.") (citations, alterations and quotation marks omitted).

There is an extraordinary aspect of this case that the majority ignores altogether: it is undisputed that Colgate expressly conditioned Neilson's continued employment on the withdrawal of her EEOC complaint. When Neilson refused to withdraw the charge, Colgate fired her. In light of this potential "smoking gun" evidence, I believe a jury would have little difficulty finding that Neilson suffered a materially adverse change in the terms and conditions of her employment under circumstances giving rise to an inference of discrimination. *See Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir.1997) ("It is conceivable that a demand to withdraw an

to be met during the few months required for the general guardian to review the matter, particularly given the imminent appointment of a general guardian and Scott Neilson's demonstrated concern for his mother's welfare.

EEOC charge could constitute retaliation, if it truly had so great an effect on the plaintiff as to alter the conditions of her employment in a material way.").[7] This evidence alone thus immediately places this case—whether or not it can ultimately be defended successfully—on sounder footing than many employment discrimination cases that are settled for significantly greater amounts.[8] It is undoubtedly this sort of consideration that might prompt an attorney to leap at the opportunity to represent a client in a retaliatory discharge case. Indeed, Neilson's former attorneys, the prominent employment law firm of Vladeck, Waldman, Elias & Engelhard, strenuously opposed the settlement negotiated by the guardian ad litem and even offered to reenter the case and "vigorously pursue Ms. Neilson's claims" on a *pro bono* basis.[9]

While I agree that a district court has the authority to approve a settlement negotiated by a guardian ad litem notwithstanding the subsequent appointment of a general guardian in state court, *see ante* at 657, I cannot disregard the fact that a general guardian invariably has more information about the personal and financial circumstances of an incompetent party than a guardian ad litem appointed pursuant to Fed.R.Civ.P. 17(c). Where, as here, the appointment of a general guardian is imminent, this factor should weigh heavily on a district court's decision whether to approve a settlement on behalf of an in-

competent party, particularly if the only negative consequence of an adjournment is a short delay with no appreciable prejudice to either the plaintiff or the defendant. In my view, the benefits of a brief adjournment to allow Neilson's general guardian to review the proposed settlement so far outweighed any speculative harm caused by a few months' delay in the case that the district court's refusal to defer consideration of the settlement amounted to an abuse of discretion. For this reason, and because the procedures employed by the district court in appointing the guardian ad litem failed to satisfy due process, I respectfully dissent.

---

7. Given the documentation and testimony by Colgate employees evidencing the company's *quid pro quo* offer, moreover, I question the district court's view that Neilson's testimony would have been "crucial" to her retaliation claim. *See* 993 F.Supp. at 228. Even if her testimony would have been vital, Dr. Pulver suggested that a general guardian could have helped Neilson obtain psychiatric treatment, which might have improved her ability to communicate to a jury. Neilson, whose "obvious intelligence and articulateness" the district court repeatedly noted, *see, e.g., id.* at 226, might well have been capable, with appropriate medical care, of testifying credibly.

8. The majority speculates that even if Neilson were to prevail at trial, her damages would be

limited in light of the jury's awareness "of Neilson's mental disorder and of its early onset." *Ante* at 654–55. Because Neilson disputes the guardian ad litem's conclusion that her illness began while she was working at Colgate, however, the majority's assessment of this factual question entirely fails to support its conclusion that the settlement was reasonable.

9. In light of Judith Vladeck's expressed willingness to forego fees for the remainder of the case, I am puzzled by the district court's suggestion, echoed by the majority, *see ante* at 657, that counsel was motivated only by a desire to recoup her fees. *See* 993 F.Supp. at 228 n. 4.