*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 21-FM-006

L.S., APPELLANT,

v.

DISTRICT OF COLUMBIA DEPARTMENT ON DISABILITY SERVICES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(MRV12-81)

(Hon. Carmen McLean, Reviewing Judge)
(Hon. Katherine M. Wiedmann, Motion Judge)

(Argued September 22, 2022      Decided November 17, 2022)

*Pierre E. Bergeron* for appellant.

*Stacy L. Anderson*, Senior Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. Alikhan*, Solicitor General at the time the brief was filed, *Caroline S. Van Zile*, Principal Deputy Solicitor General at the time the brief was filed, and *Ashwin P. Phatak*, Deputy Solicitor General, were on the brief, for appellee.

Before GLICKMAN and DEAHL, *Associate Judges*, and THOMPSON, *Senior Judge*.

THOMPSON, *Senior Judge*: In this matter, appellant L.S., a developmentally disabled ward of the District of Columbia Department on Disability Services ("the District" or "DDS"), challenges a December 11, 2020, order of the Superior Court

affirming an October 1, 2020, order by a Magistrate Judge of the Mental Health and Habilitation Branch of the Family Court (the "Habilitation Court") that denied an emergency motion filed by L.S.'s counsel. We dismiss the appeal as moot insofar as it asks this court to mandate that the Habilitation Court assess the ability of L.S. to understand the risks of returning to work at his supported employment worksite and to order that L.S. not return to work until vaccination against the COVID-19 virus is available. We affirm insofar as the appeal asks us to hold that the Superior Court erred in upholding the Habilitation Court's determination not to hold an evidentiary hearing on the motion.[1]

## I.    Background

L.S. is an individual with severe intellectual disability who is committed to DDS for the provision of habilitation services pursuant to an individual support plan ("ISP"). The services described in L.S.'s ISP include supportive employment.

---

[1] We also hereby grant appellant's requests to refer to him by his initials in this Memorandum Opinion and to publish our decision.

As of early 2020, L.S.'s supportive employment included work as a custodian at a Department of Defense ("DoD") facility in Virginia, where he had worked since 2016. The COVID-19 pandemic and state and local stay-at-home orders led to a pause in that assignment in March 2020. In August 2020, however, L.S. expressed a desire to return to work, and DDS sought to facilitate that return. L.S.'s interdisciplinary team ("IDT") determined that a number of limitations and precautions would be implemented to enable L.S. to return to work. These included limiting L.S.'s work to two days per week for five hours each day; his wearing a face mask and face shield and observing social distancing protocols; being individually escorted to and from work; having his temperature checked upon arrival at work and again at the community residential facility where he lives; and monitoring him according to Centers for Disease Control and Prevention guidelines.

Under D.C. Code § 7-1304.13(a), "[p]ersons with an intellectual disability who have been committed . . . shall have the assistance of an advocate for a person with an intellectual disability in every proceeding and at each stage in such proceedings under this chapter" (i.e., the so-called Habilitation Act, declaring the intent of the Council of the District of Columbia (the "Council") to "[s]ecure for each resident of the District of Columbia with intellectual or developmental

disability . . . such habilitation as will be suited to the needs of the person").[2]  The advocate has the duty "[t]o ensure by all means . . . that the [committed] person is afforded all rights under the law."  D.C. Code § 7-1304.13(c)(3).

In October 2017, the Habilitation Court appointed attorney Pierre Bergeron as counsel for L.S. to succeed his previous counsel.  Mr. Bergeron has advocated for L.S. in various ways, including by successfully petitioning the Habilitation Court to direct that speech-language services for L.S. be reinstated and that L.S. be provided with a communication device.

By motion dated August 26, 2020, Mr. Bergeron filed in both the Habilitation Court and the Probate Court a motion entitled "Emergency Motion for an Emergency Order and/or Injunctive Relief to Prevent the Department of Disability Services and Its Contractor Ward and Ward from Sending [L.S.] to His Supported Employment Day Program [a reference to L.S.'s job at the DoD facility]" (the "Emergency Motion").[3]  Referring to an August 14, 2019, "Day Program Court Report" filed with the court, the Emergency Motion highlighted

---

[2] D.C. Code § 7-1301.02(a)(2).

[3] The Probate Court denied the motion, reasoning that the Family Court, not the Probate Court, was the appropriate forum.  Counsel did not contest that determination.

that L.S.'s work "consists in great part of cleaning toilets" at the DoD facility and referred the court to attached articles stating that COVID-19 can be transmitted via "aerosolized feces" propelled into the air by toilet flushing. The Emergency Motion asked the Superior Court to enjoin DDS from restarting L.S.'s employment "until further order of this Court and when a vaccine protecting against COVID[-]19 is available."

The Emergency Motion acknowledged that a decision was made at an IDT meeting on August 20, 2020, that (then 70-year-old) L.S. should return to his supported employment and that L.S.'s limited medical guardian (appointed for L.S. in 2008 in a Probate proceeding) had concurred in that decision. The Emergency Motion asserted, however, that counsel did not believe that the decision to return L.S. to supported employment at a "highly contagious" site during the pandemic, at a time when DDS workers, Department of Defense employees, attorneys, and others were being permitted to work from home, "belong[ed] to the Limited Medical Guardian." The Emergency Motion asserted that because of L.S.'s severe intellectual disability, he would not be able to process the "potentially deadly risks

of returning to work," which assertedly had not been explained to him by his case manager or by the limited medical guardian.[4]

DDS opposed the Emergency Motion, asserting that L.S. had "not been declared incapacitated to make a decision whether to maintain his employment and he ha[d] expressed his interest in returning to work" and arguing that the Habilitation Act safeguarded L.S.'s decision to return to work. DDS noted that the IDT decision had been upheld by the DDS Human Rights Advisory Committee and that the IDT had put safety protocols in place and contended that to grant the motion would violate L.S.'s civil rights and his right to meaningful employment.

Magistrate Judge Katherine M. Wiedmann denied the Emergency Motion in a bench ruling on September 17, 2020, and in a written order dated October 1, 2020. Magistrate Judge Wiedmann reasoned that while the Habilitation Court has jurisdiction to determine whether an individual habilitation plan satisfies the requirements of the Habilitation Act, it does not have authority to adjudicate a "perceived violation sound[ing] in tort or some other legal theory stemming from

---

[4] Counsel also asserted that he had asked L.S. whether "he minded waiting to go[] back to work until the environment is safe," and L.S. had consented. On August 31, 2020, the IDT team met again with L.S., who reaffirmed that he would like to return to work.

health and safety concerns" or relating to medical issues. Magistrate Judge Wiedmann found that the Emergency Motion was not challenging any deficiency in L.S.'s habilitation plan and emphasized that under the law, L.S. "is presumed to have capacity to make his own decisions regarding whether he wants to return to work" and to do so in consultation with his limited medical guardian to the extent that health and safety issues related to his work present medical issues. The Magistrate Judge declined to make any determination regarding health and safety risks at L.S.'s workplace. She also remarked that counsel for L.S. should "proceed with caution" to the extent that he was advocating the overruling of L.S.'s decision about returning to work despite his expressed wishes because counsel owed "[u]ndivided loyalty to [the] client . . . [as] a fundamental tenet of the attorney-client relationship."

There followed a petition for review by an Associate Judge. Associate Judge Carmen G. McLean denied the motion for review on December 11, 2020. Judge McLean declined to find that the Habilitation Court lacked authority to address health and safety risks associated with habilitation services; she found it

> at least plausible that the question of [L.S.] returning to work during a pandemic touches on the requirement that individuals 'be taught skills that help them learn how to effectively utilize their environment and how to make choices necessary for daily living,' D.C Code

§ 7-1305.02, or even the comprehensive evaluation requirements of D.C. Code § 7-1305.04.

Judge McLean found, however, that the Habilitation Court did not have the authority to grant the requested relief. She found that the Emergency Motion's argument that L.S. lacked the capacity to decide to re-engage in supportive employment services was without merit as in direct conflict with the legal presumption of capacity. She noted that under D.C. Code § 21-2002(d), "[a]n individual shall be presumed competent and to have the capacity to make legal, health-care, and all other decisions for himself or herself, unless certified otherwise under section 21-2204 or deemed incapacitated or incompetent by a court," and that under the Habilitation Act, "[a] determination by the [c]ourt . . . that a person 14 years of age or older is incompetent to refuse commitment shall not be relevant to a determination of the person's competency with respect to other matters not considered by the [c]ourt." D.C. Code § 7-1303.13. Judge McLean found no "provision that identifies or elucidates a procedure for a Habilitation Court to separately determine an individual's competency or capacity for discrete habilitation decisions."[5]

---

[5] Judge McLean also noted that the Guardianship Statute provides a means to evaluate a developmentally disabled individual's capacity; various procedural protections; and a clear and convincing standard of proof.

This appeal followed on January 6, 2021. Appellant's briefs argue that the reviewing Associate Judge erred in upholding the order by which the Habilitation Court (1) declined to assume "jurisdiction over . . . the health and safety of [L.S.'s] habilitation work place" and (2) failed to "assess[] [L.S.'s] capacity to make health and safety decisions based on the clinical data" and to hold an evidentiary hearing on these issues.

The record indicates that since the filing of the Notice of Appeal, L.S. has received a COVID-19 vaccine in February 2021 and a booster shot in November 2021. L.S. returned to work on September 28, 2020 (and as of the date of a review hearing on October 29, 2020, had not tested positive for COVID-19 and had no symptoms of the virus). L.S. stopped working for a time in December 2020, but returned to work in 2021. In addition, on August 12, 2021, the Probate Court, upon a petition by DDS that relied on an updated psychological evaluation of L.S., appointed Diann Dawson as L.S.'s general guardian.[6] As a substitute decision-maker for L.S., and as a member of L.S.'s IDT, the general guardian agreed to his

---

[6] DDS asked the Probate Court to "expand[] Ms. Dawson's limited medical guardianship to a general guardianship." The petition stated that L.S. was unable to make decisions or provide consent for decisions relating to habilitation planning.

return to work.  As of oral argument in this matter on September 22, 2022, L.S. was continuing to work with the agreement of the general guardian.

## II. Analysis

### A. Standing and Mootness

We have considered whether to dismiss the appeal for Mr. Bergeron's lack of standing, a matter that was discussed briefly at oral argument.  The issue is whether counsel may, through this appeal, pursue a goal — an order that would bar DDS from facilitating L.S.'s return to work — that is opposed by L.S.'s general guardian and, apparently, by L.S. himself.[7]  *See, e.g.*, Superior Court of the District of Columbia, Family Court Attorney Practice Standards for Mental Habilitation Attorneys ("Practice Standards for Mental Habilitation Attorneys"), an attachment to Superior Court Administrative Order 15-17, at 10 (explaining that certain

---

[7] The issue of standing also was alluded to by DDS's counsel during a proceeding before the Habilitation Court on September 14, 2020.  Counsel for DDS raised the issue of whether, if L.S. wished to return to work, his counsel would "have any legal standing to [pursue an order to] prevent him returning to work[.]"  Magistrate Judge Wiedmann agreed this was an issue (and, as noted above, in her October 1, 2020, order, she cautioned Mr. Bergeron about his duty of loyalty to the client).

decisions relating to habilitation, such as whether to accept or reject a recommendation for day program services and decisions about the placement and location where services are to be delivered "are ultimately the province of the respondent [ward]"); *see also Neilson v. Colgate-Palmolive Co.*, 199 F.3d 642, 650 (2d Cir. 1999) (quoting 6A Charles Alan Wright et al., *Federal Practice and Procedure* § 1548, at 372 (2d ed. 1990) for the principle that "State substantive law usually provides that the general guardian of a[n] . . . incompetent has the legal right to maintain an action in h[er] own name for the benefit of h[er] ward . . . . [and] is the real party in interest").[8]

We ultimately do not rely on lack of standing as a basis for resolving this matter because, at least arguably, Mr. Bergeron has standing to pursue this appeal to advance the claim that placing L.S. in a "toxic environment where he can contract COVID 19 . . . constitutes a denial of habilitation service." Pursuant to his duty "[t]o ensure by all means . . . that the [committed] person is afforded all rights

---

[8] *But see Ad Hoc Comm. of Concerned Tchrs. v. Greenburgh No. 11 Union Free Sch. Dist.*, 873 F.2d 25, 30 (2d Cir. 1989) (noting that "[f]ederal courts . . . have repeatedly affirmed a court's power to determine that the interests of a[n] . . . incompetent will be best represented by a 'next friend' or guardian ad litem and not by an authorized representative such as a . . . general guardian"); *Boyd v. Lancaster*, 132 P.2d 214, 217-18 (Cal. Ct. App. 1942) (rejecting argument that where there is a general guardian, that person alone is entitled to bring a suit on behalf of the ward such that a suit by a guardian ad litem is not maintainable).

under the law," D.C. Code § 7-1304.13(c)(3), Mr. Bergeron has an obligation to advocate for the furnishing of the services to which L.S.'s ISP entitles him, even if (as possibly was the case with respect to L.S.'s discontinued speech-language services) L.S., and/or his limited medical guardian, was content to forgo them. *See also* Practice Standards for Mental Habilitation Attorneys at 8 ("The Mental Habilitation Attorney's duty is the representation of the respondent's civil and legal rights and interests in any proceeding relating to the respondent's commitment . . . ."). It thus appears that — unlike a counsel who is appointed to represent an individual who is the subject of a guardianship/intervention proceeding and who must "represent zealously that individual's expressed wishes," D.C. Code § 21-2033(b)(1) — a counsel appointed under the Habilitation Act is not necessarily obligated to be guided by the client's wishes (as expressed by the client or as discerned by the general guardian) or by the general guardian's substituted judgment. The "[s]trategic and tactical legal decision[]" to present the claim for injunctive relief involved here as a denial of habilitative services plausibly is a claim that may "be made by counsel after consultation").[9] Practice Standards for Mental Habilitation Attorneys at 10-11.

---

[9] That said, an argument that allowing L.S. to return to an allegedly unsafe work environment constituted a denial of habilitation services is not the argument that Mr. Bergeron made before the Habilitation Court, and thus we consider the

As the issue of standing is a complex one that has not been fully briefed, we turn instead to the doctrine of mootness, which the District contends requires that the appeal be dismissed.[10]  The District invokes our case law holding that a pending appeal generally becomes moot when there occurs an event that renders the relief sought by a party impossible or unnecessary. *See, e.g.*, *Classic CAB v. D.C. Dep't of For-Hire Vehicles*, 244 A.3d 703, 705 (D.C. 2021) (quoting *Settlemire v. D.C. Off. of Emp. Appeals*, 898 A.2d 902, 905 (D.C. 2006)).  In particular, the District relies on two developments since the Emergency Motion was filed and resolved: first, the undisputed evidence L.S. has received COVID-19 vaccinations and a booster shot, such that the relief sought through the Emergency

---

argument forfeited.  Arguments not raised in the trial court "are normally spurned on appeal." *Crockett v. Deutsche Bank Nat'l Tr.*, 16 A.3d 949, 953 (D.C. 2011).

[10] Like standing, mootness is "a threshold question of law that must be resolved prior to, and independently of, the merits of the case." *B.J. v. R.W.*, 266 A.3d 213, 215 (D.C. 2021); *Geary v. Nat'l Newspaper Publrs. Ass'n*, 279 A.3d 371, 372 (D.C. 2022).  Mootness and standing are related concepts in that, generally speaking (putting aside the exceptions to the mootness doctrine), the requisite interest that "must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Welsh v. McNeil*, 162 A.3d 135, 144-45 (D.C. 2017) (Glickman, J., concurring in part).

A Motions Division of this court denied without prejudice DDS's motion to dismiss this appeal as moot, but that denial does not bind this merits panel. *See Clark v. Bridges*, 75 A.3d 149, 150-51 (D.C. 2013) (citation omitted) ("[A] Merits Division of this court is not bound by a Motions Division's decision to deny a motion to dismiss an appeal . . . unless the motion is denied with prejudice.").

Motion — to prevent Mr. Smith's return to work until a vaccine was available — is no longer necessary; and second, the Probate Court's appointment of a general guardian for L.S., signifying the Probate Court's crediting of a July 2021 psychologist's report that L.S. lacks capacity to make habilitation decisions (such as the discrete decision to return to work) and the Probate Court's acceptance of DDS's argument that L.S. "is unable to make decisions or provide consent for decisions relating to . . . habilitation planning," such as an informed decision about supported employment. The District argues that the Probate Court determination renders moot counsel's request that this court require the Habilitation Court to assess the ability of L.S. to understand the risks of returning to work at his supported employment site.[11]

---

[11] The District also persuasively addresses why the claims advanced in the Emergency Motion should not be deemed to fall within the capable-of-repetition-yet-evading-review exception to the mootness doctrine. *See Hardesty v. Draper*, 687 A.2d 1368, 1371 (D.C. 1997). It asserts that L.S. is

> now fully vaccinated against COVID-19 and has a substitute decision-maker, resolving the concerns underlying counsel's request for injunctive relief. And because there is now an available COVID-19 vaccine for everyone in DDS's care, there is no risk that similarly situated DDS clients will choose to return to work during this pandemic in the absence of an available vaccine.

Disagreeing with the District on these points, L.S.'s reply brief suggests that the Emergency Motion "c[ould] only [have] mean[t]" to request an order that L.S. not be permitted to return to his supportive employment until there is available a vaccine that "substantially blocks" COVID-19 variants and breakthrough infections, a goal that has not been achieved. However, we see no indication that this is what the Emergency Motion contemplated. Mr. Bergeron also asks us to hold that L.S.'s capacity to understand the risks of and to consent to returning to work is to be assessed by the Habilitation Court under the Habilitation Act and not by the Probate Court as part of a more general determination of incapacitation under the Guardianship Act. We see no reason to reach that conclusion. The Council has made clear its intent that the provisions of the Guardianship Act (set out in chapter 20 of Title 21 of the D.C. Code) apply to developmentally disabled individuals served by DDS just as they do to other incapacitated individuals. *See, e.g.*, Report on Bill 20-710, the "Guardianship Amendments Act of 2014" before the Committee on the Judiciary and Public Safety, Council of the District of Columbia, at 6 & 6 n.18 (Nov. 25, 2014) (discussing amendments to D.C. Code § 21-2033 triggered by a decision of this court pertaining to a DDS-involved developmentally disabled ward). Moreover, the Guardianship Act contemplates a role for DDS in petitioning for removal of a guardian for failure to discharge his or her duties as to the ward. *See* D.C. Code § 21-2049(a)(3).

For the foregoing reasons, we dismiss this appeal as moot to the extent that it seeks an order to DDS "not to return [L.S.] to work" until a COVID-19 vaccine is available or until there is an evidentiary hearing by the Habilitation Court on L.S.'s ability to appreciate the health and safety risks of returning to work.

## B. Evidentiary Hearing

We now address the claim that the Superior Court erred in affirming the Habilitation Court's order given that the Habilitation Court declined to hold an evidentiary hearing on the safety of L.S.'s supportive employment worksite. At oral argument, we understood counsel for the District of Columbia to agree that this claim is not moot. We agree. Even though much has changed since the Emergency Motion was filed,[12] there could still be issues about the safety of L.S.'s

---

[12] According to the August 14, 2019, "Day Program Court Report" included in the record, around the time the Emergency Motion was filed, L.S.'s work tasks included cleaning of toilets and urinals. By contrast, according to an October 8, 2020, Day Program Court Report, L.S.'s work tasks at the DoD facility included sweeping, dusting, vacuuming, and assisting with trash handling, but L.S. "does not clean toilets." This statement was not disputed during the October 29, 2020, ISP review proceeding, and appellant's briefs also do not dispute the statement. Thus, there is no evidence in the record that the particular alleged hazard that counsel highlighted in the Emergency Motion still exists. Moreover, we can take notice that more and more people in our community have returned to their places

supportive employment work environment.   We note that at the annual review hearing on L.S.'s ISP held on October 29, 2020, Mr. Bergeron proffered that he had a witness — L.S.'s supportive employment job coach — who would testify that L.S. did not always wear the face mask he was instructed to wear as part of his personal protective equipment at the worksite.

We also note preliminarily that, like Judge McLean, we will not assume that the Habilitation Court is without authority to address health and safety risks associated with a ward's ISP habilitation services.   We need not resolve the issue here, but we find it conceivable that hazards attendant to a supportive employment worksite could amount to a constructive denial of ISP-mandated supportive employment, and that allegations about such hazards could warrant an evidentiary hearing.

On the present record, however, we can find no erroneous exercise of discretion in the Habilitation Court's determination not to hold a hearing on the Emergency Motion.   During a proceeding before the Habilitation Court on September 14, 2020, when asked to proffer what witnesses he would present at an

---

of work, including many Superior Court judges and staff, since the height of the COVID-19 pandemic.   Thus, the work-from-home practices cited in the Emergency Motion may no longer be the norm.

evidentiary hearing on the motion, Mr. Bergeron named only witnesses who would testify about L.S.'s wishes and would say that they heard L.S. express that he was willing to wait to return to work. On September 15, 2020, Mr. Bergeron filed an additional pleading in which he asserted, regarding the claim that the supported employment worksite was unsafe, that the Habilitation Court could rely on the "scholarly articles" he had presented with the Emergency Motion, and in which he requested that the court "take judicial notice [of] how these dangers [would] affect [L.S.] if he returned to work." Because counsel did not proffer that he would call witnesses who would testify about the safety of L.S.'s supportive employment worksite, we will not disturb the court's decision not to hold a hearing on the safety of the work environment.[13]

***

For the foregoing reasons, this appeal is dismissed as moot insofar as it asks this court to mandate that the Habilitation Court assess the ability of L.S. to

---

[13] We note that Mr. Bergeron proffered the job-coach witness *after* Magistrate Judge Wiedmann had denied the Emergency Motion and while her ruling was under review by Judge McLean. The instant appeal does not challenge Magistrate Judge Wiedmann's ruling declining to hear, during the ISP review proceeding, testimony from L.S.'s job coach or testimony about whether it was safe for L.S. to return to work.

understand the risks of returning to work at his supported employment work and to order that L.S. not return to work until a vaccination against the COVID-19 virus is available.  We affirm the ruling of the Superior Court upholding the Habilitation Court's determination not to hold an evidentiary hearing on the Emergency Motion.  It is

*So ordered.*